THE STATE OF FLORIDA, *ex rel.*, RAILROAD COMMISSION-
ERS, *Relators*, v. THE FLORIDA EAST COAST RAIL-
WAY COMPANY, A CORPORATION, *Respondent*.

Opinion filed April 5, 1916.

1. A demurrer to the return to an alternative writ of mandamus
   admits the truth of all such matters of fact as are sufficiently
   pleaded.

2. In an application by the Railroad Commissioners for a writ
   of mandamus to compel a railroad corporation to establish
   and maintain an agency station at a certain designated point
   on the line of its railroad, where it appears in the return
   of the respondent which was demurred to by the relators,
   that the respondent has an agency station on either side on
   its line, one of which is "situated a trifle more than two
   miles from" and the other "only 1.8 miles from O.," such
   designated point on its line, and that the principal amount
   of business transacted at such point O. is during a period of
   four months, during which time the respondent kept and
   maintained a "temporary agent" at such point, such matters
   of fact set out in the return, which are admitted to be true
   by the demurrer, show that the order made by the relators
   for the establishment and maintenance of an agency station
   at such point is unreasonable and that no necessity exists for
   the establishment of such agency station.

Original proceedings in Mandamus.

Demurrer and motion to strike overruled.

*D. C. McMullen,* for Relators.

*Alex. St. Clair-Abrams,* for Respondent.

SHACKLEFORD, J.—This is an original application to this court for a writ of mandamus requiring the respondent, the Florida East Coast Railway Company, to conform to an order of the Railroad Commissioners requiring and directing the respondent to establish and maintain an agency station at Ojus, Florida. Such order of the Railroad Commissioners is as follows:

*"Order No.* 466.
*File No.* 3603.

*"Before the Railroad Commissioners of the State of Florida.*

"In the Matter of the Establishment of an Agency Station at Ojus.

"After due and lawful notice to all parties in interest, the Railroad Commissioners of the State of Florida met in session at Tallahassee on the 16th day of December, 1914, at ten o'clock in the morning, to hear and consider whether or not they ought to require the Florida East Coast Railway Company to erect a depot building at Ojus and to establish there a permanent agency. The petitioners in the said matter appeared by their attorney, R. H. Seymour, and the Florida East Coast Railway Company, having filed its written answer in the said matter, appeared by its attorney, Alexander St. Clair-Abrams. And, after hearing all who desired to be heard, the said Commissioners took the matter under advisement.

"And now on this day, the Railroad Commissioners of the State of Florida, being advised in the premises, do find that the Florida East Coast Railway Company has voluntarily maintained for many years at Ojus afore-

said a non-agency station at which local passenger trains have been accustomed to stop on flag and at which freight has been received and delivered; that the said station is 2.8 miles from Hallandale and 1.8 miles from Fulford, both regular agency stations; that Ojus, having been voluntarily established by the said company as a station, ought to be provided with proper and adequate facilities for the accommodation of patrons of the said station; that the facilities now maintained and heretofore maintained at Ojus aforesaid are inadequate and insufficient for the proper accommodation of the patrons of the said company desiring to use the said railway station; that the freight and passenger traffic handled at the said point is already extensive and is increasing; that the gross earnings of the said company derived from the said station were, for the year ended June 30, 1913, $22,920.48, and for the year ended June 30, 1914, $48,-470.34; and that the proper handling of the traffic at the said point requires the maintenance of an agency station until such time as the Commissioners may find the business done at said point insufficient to warrant the maintenance of an agency.

"It is therefore *considered, ordered and adjudged* by the Railroad Commissioners of the State of Florida that the Florida East Coast Railway Company be and is hereby required to provide adequate additional facilities at Ojus aforesaid by establishing and maintaining at the said point an agency station, and by remodeling the present station building so as to provide a waiting room for white passengers which shall contain at least 180 square feet of floor space, and a waiting room for colored passengers which shall contain at least 180 square feet of floor space.

"And it is further *ordered* that the said station shall be equipped with suitable closets, one for each sex for the use of white passengers and one for each sex for the use of colored passengers; and that the said station shall be provided with suitable approaches thereto and walks alongside the track and adjacent to the station building for the convenience and comfort of passengers entrain- and detraining.

"And it is further *ordered* that the said agency shall be established on or before the 1st day of February, 1915, and shall be maintained thereafter, and the facilities herein required shall be provided and this order fully complied with on or before the 15th day of March, 1915.

"*Done and ordered* by the Railroad Commissioners of the State of Florida in session at their office in the City of Tallahassee, the Capital, this 14th day of January, A. D. 1915.

(Signed) "R. Hudson Burr,<br>"<em>Chairman.</em>

An alternative writ of mandamus issued which is as follows:

"*The State of Florida*
        *to*
*Florida East Coast Railway Company, Greeting:*

"*Whereas,* by Petition filed in this Our Supreme Court of the State of Florida, wherein R. Hudson Burr, Newton A. Blitch and Royal C. Dunn, as Railroad Commissioners of the State of Florida, are the Relators, and the Florida East Coast Railway Company, a corporation, is the Respondent, it has been made to appear:

"1.    The Florida East Coast Railway Company is a railroad corporation created and existing under the laws

of the State of Florida and doing business in said State as a common carrier of goods and passengers; that said company is now maintaining, and has for many years last past voluntarily maintained a non-agency station at Ojus, on its line of railway in Dade County, Florida, and has been engaged in the business of transporting goods and passengers to and from said non-agency station as such common carrier for hire.

"2.    That on to-wit, the 7th day of December, 1914, the Railroad Commissioners of the State of Florida did issue their Notice No. 65, wherein and whereby they notified the said Florida East Coast Railway Company that on the 16th day of December, 1914, they would hold a session at their office in Tallahassee for the purpose of considering and determining whether or not they ought to make an order requiring the said company to establish and maintain an agency at Ojus aforesaid and to maintain an agent at said station, and to consider and determine whether or not they ought to require the said company to erect a depot building at Ojus aforesaid of suitable and necessary dimensions and arrangement, and to consider such other matters as might arise in the premises.

"3.    Pursuant to said Notice the Railroad Commissioners of the State of Florida were duly in session on the date last mentioned, whereupon the Florida East Coast Railway Company appeared by its attorney, Hon. Alexander St. Clair-Abrams, and filed its written answer in the said matter, setting forth the amount of business done by the said company at the said station, among other things, and urging its reasons why an order should not be entered in the premises; and there also appeared on behalf of the petitioners Mr. R. H. Seymour, of Miami, Flor-

ida. And after hearing all who desired to be heard, the Commissioners took the matter under advisement.

"4. Thereafter, on to-wit, the 14th day of February, 1914, the Railroad Commissioners did make and enter their Order No. 466 in the aforesaid matter, wherein and whereby they did order that the Florida East Coast Railway Company provide adequate additional facilities at Ojus aforesaid by establishing and maintaining at the said point an agency station, and by remodeling the present station building so as to provide a waiting room for white passengers which shall contain at least 180 square feet of floor space and a waiting room for colored passengers which shall contain at least 180 square feet of floor space. And it was further ordered that the said station be equipped with suitable closets, one for each sex for the use of white passengers and one for each sex for the use of colored passengers, and that the said station be provided with suitable approaches thereto and walks alongside the track and adjacent to the station building for the convenience and comfort of passengers entraining and detraining. And it was further ordered that the said agency station should be established on or before the first day of February, 1915, and be maintained thereafter, and the facilities therein required be provided and the said order fully complied with on or before the 15th day of March, 1915. A copy of the said order No. 466 is hereto attached and made a part hereof as Exhibit A.

"5. The said Florida East Coast Railway Company has violated, disregarded and refused to obey, and continues to violate, disregard and refuse to obey the aforesaid Order No. 466, in that it did not, on or before the 1st day of February, 1915, and has not from thence hitherto, established an agency station at Ojus aforesaid,

and has not at any time since the entry of the said Order maintained an agency at Ojus; and in that the said company has not on said date, and has not at any time since the entry of the said Order, remodeled the existing station building so as to provide the waiting rooms and other facilities required in and by said Order No. 466.

"The Railroad Commissioners of the State of Florida, and the people of said State, are without adequate remedy in the premises unless it be afforded by the interposition of this Court through a writ of mandamus.

"*Now, therefore,* We, being willing that full and speedy justice shall be done in the premises, do command you, the Florida East Coast Railway Company, forthwith

"To establish and maintain an agency station at Ojus, Florida; and

"To so remodel the present station building at Ojus as to provide a waiting room for white passengers with not less than 180 square feet of floor space and a waiting room for colored passengers with not less than 180 square feet of floor space;

"To equip the said station with suitable closets, one for each sex for the use of white passengers and one for each sex for the use of colored passengers, and provide suitable approaches thereto, and walks alongside the track and adjacent to the station building for the comfort and convenience of passengers entraining and detraining.

"And in all respects to comply with, observe and obey the said Order No. 466.

"Or that you appear before the Justices of this Our Supreme Court sitting within and for the State of Florida at the Court Room in the City of Tallahassee, the Capital, on the 26th day of October, 1915, at ten o'clock

in the morning of that day, and show cause why you refuse so to do.

"*And have you then and there this writ.*

"*Witness* the Honorable *R. F. Taylor,* Chief Justice of the Supreme Court of the State of Florida, and the seal of the said Court, at Tallahassee, the Capital, this 12th day of October, A. D. 1915.

"G. T. WHITFIELD,

(SEAL) *"Clerk Supreme Court, State of Florida."*

To this writ was attached as an Exhibit a copy of the order which we have set out above. The respondent filed the following return:

"Now comes the Florida East Coast Railway Company, by its Attorney and Solicitor, Alex. St. Clair-Abrams, and for return to the Alternative Writ herein issued, says:

"1. It admits as true the allegations of the first paragraph of the Alternative Writ.

"2. It admits as true the allegations of the second paragraph of the Alternative Writ.

"3. It admits as true the allegations of the third paragraph of the Alternative Writ in so far as it recites the appearance of the Attorney for the Respondent and the Attorney for Petitioners; but this Respondent says that, if the last sentence of said third paragraph is intended to create the impression that any others than the two attorneys were heard at said hearing, the allegations of said sentence are not true; that no other persons were heard at said meeting than R. H. Seymour, Attorney for the petitioners, and Alex. St. Clair-Abrams, Attorney for the Florida East Coast Railway Company; that no witnesses whatsoever were introduced to sustain the subsequent action of the Commissioners; that, if the

Commissioners saw or examined any witnesses to sustain the petition, they did so ex parte and outside of the presence of the Attorney for the Respondent and this Respondent was never given any opportunity to confront or to cross-examine said witnesses; that, as a matter of fact, not one single word of testimony was taken at said hearing; that all that occurred there was the argument and statements of R. H. Seymour, the Attorney for the Petitioners, against which argument this Respondent's Attorney repeatedly protested and repeatedly called to the attention of the Commissioners that the assertions and argument of the said R. H. Seymour were not testimony and that there was nothing before the said Commissioners in the shape of a single witness or any testimony of any kind to sustain the demands of the petitioners; that at the hearing the said R. H. Seymour offered to produce ex parte evidence, but this Respondent, through its Attorney, declined to consent to his doing so and insisted on its right to confront the witnesses and examine them in relation to the matters and things set forth in the petition.

"And this Respondent says that it was entitled as of right to be advised of the evidence upon which the action of the Commissioners was based; that it was entitled as of right to confront the witnesses and to examine all evidence brought before the Commissioners and to meet and rebut the same if it could; but this Respondent says that, except the petition and the speech or argument of R. H. Seymour, Attorney for the Petitioners, not a single witness appeared before the Railroad Commissioners in the presence of this Respondent's Attorney, or any of its officers; and that by reason hereof the Respondent was deprived of its Constitutional right of due process of law.

"This Respondent further says that not until after the hearing did the Respondent obtain a list of the names of the petitioners; that nothing but a copy of the petition, without the petitioners' names was ever served upon or sent to this Respondent until after the hearing; that this Respondent before the hearing requested a list of the petitioners for the purpose of making an investigation before the hearing; but did not receive them until after the hearing had taken place and after the Respondent had offered to pay for a copy of the list of petitioners.

"And further answering this Respondent says that, after the hearing and after obtaining a copy of the list of petitioners, this Respondent caused an investigation to be made and ascertained that a large number of the alleged signers were either only temporary residents making a single crop or residents doing their business at other stations on the line of this Respondent's road; that of the alleged 110 signers of the petition, 56 only were residents of Ojus, including 5 women, the wives or connections of the male signers; that 22 were non-residents, some of whom had no business whatever at Ojus, or had previously and were then doing their business at Fulford or Hallandale; that 15 of the alleged signers had either left the place or could not be found or had never been known to be there; that 8 of the alleged signers were only temporary residents and had no permanent home in the vicinity; that 7 of the alleged signers were minors, children of the signers of the petition; that one signer resided within two miles of Hallandale and did all his business there.

"This Respondent further says that investigation showed that a number of the alleged signers had no recollection of ever signing the petition, while others had

requested their names to be taken therefrom before the petition was forwarded to the Railroad Commissioners.

"And this Respondent further answering alleges that not a single one of the signers of the petition, except R. H. Seymour, the Attorney for the petitioners, ever appeared before the Railroad Commissioners at the hearing and testified to a single fact warranting the making of the order for the establishing of a station agency at Ojus.

"And this Respondent further says that R. H. Seymour does not live at Ojus or near there, but that he is an attorney-at-law residing in Miami and having his office and place of residence in that city.

"4. And for an answer to the fourth paragraph of the Alternative Writ this Respondent says that it is true that on the 14th day of February, 1915, the said Railroad Commissioners did make and enter their Order No. 466 in manner and form as set forth in said paragraph 4; but this Respondent says that said Order was unreasonable and unjust for the following reasons, to-wit: That the flag station at Ojus is situated on the main line of the Florida East Coast Railway between Jacksonville and Miami, over which main line a large number of freight and passenger trains pass every day; that some time before the issuing of this Order this Respondent was required to establish a regular agency station at Hallandale, situated a trifle more than two miles from Ojus; and this Respondent, after giving due consideration thereto, established said regular agency station at Hallandale; that still later the Railroad Commissioners, by their Order No. 434, dated the 17th day of February, 1914, required this Respondent to establish a regular agency station at Fulford, only 1.8 miles from Ojus; and, although this Respondent did not think the business

at Fulford called for the establishment of a regular agency staion, nevertheless, because of the existence of Ojus, 1.8 North of Fulford and to enable all persons living and doing business between Hallandale and Fulford, to have the advantage of two agency stations, this Respondent established a regular agency station at Fulford; and that said regular agency stations at Fulford and Hallandale existed at the time of filing the petition from Ojus and still exist; and this Respondent says that from Fulford to Ojus and from Ojus to Hallandale is a county road paved with rock, affording quick and easy transit to all persons living between Hallandale and Fulford to drive to either station and transact business with a regular agent at either Fulford or Hallandale; that, in addition thereto, beginning the 2nd of March, 1915, this Respondent established a temporary agent at Ojus during the shipping season, which temporary agent was still at Ojus at the time of filing this return, although this Respondent says that the presence of said temporary agent at Ojus was not necessary for the prompt and faithful transaction of business there; but that he was established there to afford further facilities to shippers at Ojus during the shipping season.

"And further answering paragraph 4 this respondent says that during the months when there is no temporary agent at Ojus the business is easily and efficiently transacted by the Respondent's conductors on trains and the train crews; that the close proximity of Fulford and Hallandale and the excellent county roads from Fulford to Ojus and Ojus to Hallandale and also the numerous private settlement rock roads enable all persons desiring to communicate with any established regular agency, to speedily and quickly visit either Hallandale or Fulford for that purpose. Annexed hereto is a plat or map

showing the location of the three stations of Fulford, Ojus and Hallandale with the surrounding territory of each, the roads and the accessibility from Ojus to both Hallandale and Fulford, which plat is marked Exhibit 'I,' and this Respondent prays it may be taken as a part of this Return.

"And this Respondent respectfully submits that it is impracticable and unreasonable to require a railroad company to establish regular agency stations in such close proximity to each other as Order No. 466 requires; and that it is not unreasonable to require the public to travel a short distance to transact business with a regular agent.

"And further answering paragraph 4 of the Alternative Writ this Respondent says that the main line of Respondent's road is already over-crowded with regular agency stations at short distances from each other, most om which have been established by order of the Relators (the Railroad Commissioners), over the protests and objections of this Respondent and only ultimately complied with to avoid litigation and conflict with said Railroad Commissioners, the effect of which is necessarily to impede and delay the movement of all of its trains and to render it more difficult to properly and efficiently perform its corporate functions in the speedy transit of passengers and freight; that it is unreasonable and unjust to require the Respondent with its limited business to establish regular agency stations as close as 1.8 miles apart, and to thereby impose upon this Respondent a fixed annual additional charge and an additional permanent investment, as hereinafter set forth.

"And further answering paragraph 4 this Respondent says that, to etsablish a general agency station at Ojus, it will be necessary not simply to remodel the ex-

isting building, but to construct a freight and passenger station building and also a residence for the agent there; that the average cost of constructing such buildings with the necessary supplies and equipment would be $4,170.00, and the annual cost of maintaining such agency would not be less than $1,388.00; that in addition thereto, this Respondent would have to obtain the money with which to make this permanent investment, thereby adding an annual charge of approximately $250.00 and imposing upon this Respondent an additional annual expense of approximately $1,600.00.

"And further answering paragraph 4 this Respondent says that for the fiscal year ending June 30, 1913, the entire gross earnings of the station at Ojus were $22,920.48, of which the freight forwarded, exclusive of rock, amounted to $16,233.25; that of this $16,233.25, $15,750.42 was forwarded during the months of February, March, April and May, leaving a balance of $482.83 during the remaining 8 months; the earnings from freight received amounted to $3,645.67, of which $1,890.47 were during the months of February, March, April and May, leaving $1,755.20 for the remaining 8 months; the passenger earnings in and out amounted to $2,496.05, of which $1,318.40 were during the months of February, March, April and May, leaving $1,177.65 for the remaining 8 months; that of the entire gross earnings of $22,920.48, $18,959.29 were during the four months of February, March, April and May, leaving only $3,961.19, which included $545.51 from rock forwarded, for the remaining 8 months of the year. And this Respondent says that during these 8 months the presence of a resident agent at Ojus was unnecessary; that he would have but little or nothing to do.

"And this Respondent says that for the fiscal year

ending June 30, 1914, the gross earnings at Ojus station increased to $48,470.34; but this Respondent respectfully shows that this increase was purely temporary; that during the fiscal year ending June 30, 1914, the freight from oranges, lemons and limes increased to $1,322.93, while the receipts from vegetables decreased to $7,441.46 (being less than half the amount of the receipts for the previous year); that the receipts from shipment of rock increased from $545.51 for the fiscal year ending June 30, 1913, to $32,006.64, being practically two-thirds of the entire gross business of Ojus; that of $40,937.36 of freight forwarded during the fiscal year ending June 30, 1914, $32,006.64 was for rock, leaving $8,930.72 from all other sources of freight. Of this sum $7,551.79 was shipped during the months of February, March, April and May, leaving only $1,378.93 for the remaining 8 months of the year, or an average of $172.37 per month; that of $4,269.91 from freight received, $1,746.70 was during the months of February, March, April and May, leaving $2,523.21 for the remaining 8 months; that of $3,263.07 earned from passengers in and out, $1,029.25 was during the months of February, March, April and May, leaving $2,233.82 for the remaining 8 months; that the entire gross earnings at Ojus for the fiscal year ending June 30, 1914, exclusively of rock, amounted to $16,463.70, of which $10,327.74 were during the months of February, March, April and May, leaving $6,135.96 for the remaining 8 months of the year. And this Respondent says that during these 8 months the presence of a resident agent at Ojus was unnecessary; that he would have but little or nothing to do.

"And this Respondent says that for the fiscal year ending June 30, 1915, the gross earnings at Ojus station were $55,858.52; that of this amount $36,114.21 was for

rock; that of $9,157.62 from freight forwarded exclusively of rock, $8,536.64 was during the months of February, March, April and May, leaving only $620.98 for the remaining 8 months of the year; that of $5,984.10 from freight received, $2,612.98 was during the months of February, March, April and May, leaving $3,371.12 for the remaining 8 months; that of $4,602.59 earned from passengers in and out $1,465.38 was during the months of February, March, April and May, leaving $3,-137.21 for the remaining 8 months; that the entire gross earnings at Ojus for the fiscal year ending June 30, 1915, exclusive of rock, were $19,744.31, of which $12,615.00 were during the months of February, March, April and May, leaving $7,129.31 for the remaining 8 months of the year. And this Respondent says that during these 8 months the presence of a resident agent at Ojus was unnecessary; that he would have but little or nothing to do.

"The Respondent annexes hereto statement of freight forwarded from Ojus for fiscal year ending June 30, 1913, including all classes except rock, marked Exhibit '2;' statement of freight received at Ojus for fiscal year ending June 30, 1913, marked Exhibit '3;' statement of passenger business at Ojus for fiscal year ending June 30, 1913, marked Exhibit '4;' statement of freight forwarded from Ojus for fiscal year ending June 30, 1914, including all classes except rock, marked Exhibit '5;' statement of freight received at Ojus for fiscal year ending June 30, 1914, marked Exhibit '6;' statement of passenger business at Ojus for fiscal year ending June 30, 1914, marked Exhibit '7;' statement of freight forwarded from Ojus for fiscal year ending June 30, 1915, including all classes except rock, marked Exhibit '8;' statement of freight received at Ojus for fiscal year ending June 30, 1915, marked Exhibit '9;' statement of passen-

ger business at Ojus for fiscal year ending June 30, 1915, marked Exhibit '10;' a statement of the rock forwarded from Ojus for the fiscal year ending June 30, 1913, marked Exhibit '11;' statement of rock forwarded from Ojus for fiscal year ending June 30, 1914, marked Exhibit '12;' statement of rock forwarded from Ojus for the fiscal year ending June 30, 1915, marked Exhibit '13.'

"And this Respondent further answering says that this business in rock is necessarily temporary in its character and cannot form the basis for requiring the establishment of a permanent agency station and maintaining a permanent agent at Ojus; that, exclusive of rock, for the fiscal year ending June 30, 1913, the entire business at Ojus amounted to $22,374.97; that during the fiscal year ending June 30, 1914, exclusive of rock, the entire business at Ojus was only $16,463.70, showing a decline of nearly Six Thousand Dollars from the business of the previous year; that during the fiscal year ending June 30, 1915, exclusive of rock, the entire business at Ojus was $19,744.32, showing a decline of $2,630.65 from the business of 1913.

"And this Respondent further answering says that the regular and legitimate business at Ojus consists of vegetables and fruits, the great mass of which is moved during three or four months each year, leaving but very small business during the balance of the year; and that this business is all that the Respondent can look to from Ojus station as a matter of permanent source of income; that, as a matter of fact, as hereinbefore set forth, the rock business described and set forth is neither received at nor forwarded from Ojus station proper, but is simply credited to Ojus for convenience, there being no station of any kind at the Ojus Rock Pit Spur, which con-

29

sists of a spur constructed to the pit and maintained by this Respondent.

"And this Respondent further answering says that, while the earnings from rock are credited to Ojus and billed from Ojus, as a matter of fact, all of these rock shipments are handled from the Ojus Rock Pit Spur, some six-tenths of a mile from Ojus Station on conductors' way-bills and at estimated weights and that it is not necessary that an agency station be established at Ojus for the convenience of shipments of rock, because, even if there was an agent established at Ojus, it would be necessary, for the prompt and efficient operation of this company's freight trains, to still receive and handle this rock at the Ojus Rock Pit Spur and to ship the same on conductors' way-bills.

"And this Respondent says that the shipment of this rock is temporary, being for road purposes; that this freight is handled at such a low rate for the purpose of encouraging road building as to be almost at the cost of transportation, and leaves this Respondent but little or no profit for the handling of the freight; that necessarily this business will cease with the completion of the roads and, as a matter of necessity, cannot be permanent.

"This Respondent further answering says that the freight received during the fiscal year ending June 30, 1914, amounted to $4,269.91, being only $624.24 in excess of the freight received during the fiscal year ending June 30, 1913; that, while all of this freight is credited to Ojus station, as a matter of fact, a large part of it was delivered at Ojus Rock Pit Spur for the convenience of the workmen engaged in getting out the rock; that the total amount received from passengers out had decreased $14.40 for the fiscal year ending June 30, 1914, and for passengers in had increased $781.42, but this increase was

practically all due to passengers getting off at Ojus station and proceeding to Ojus Rock Pit Spur to work in getting out rock.

"This Respondent further answering says that during these months the public patronizing the agency is kept fully advised and informed of the arrival and departure of all freight and passenger trains; that these trains, save in exceptional cases, arrive and depart regularly according to schedule time, delays being infrequent and due solely to causes that could not be foreseen or guarded against; that during these months the conductor and train crew of all freight and passenger trains fully perform all the duties that would be imposed upon employes regularly stationed there; that they receive and deliver freights promptly; that passengers are not put to any inconvenience or expense; that there is now at Ojus a flag station building affording the most adequate facilities; in fact, during the year being far in excess of any requirements either of passengers or freight.

"And further answering said paragraph 4 this Respondent says that a number of the signers of the petition reside at Miami Gardens, a settlement about equal distance from Fulford and Ojus; that at the time of the signing of the petition and at the present time nearly all of the residents of Miami Gardens receive their mail and transact their business at Fulford; that a number of the signers of the petition are actually closer to Hallandale than they are to Ojus; that others are actually closer to Fulford than they are to Ojus; and that practically the entire population doing business at Ojus could transact their business at Hallandale and Fulford without having to travel exceeding two and a half miles in any direction. And this Respondent says that it established a flag station at Qjus when there was no regular agency station

at either Hallandale or Fulford for the local convenience of the settlers; but that, after the establishing of a regular agency station at Hallandale and at Fulford, it was and is unjust and unreasonable to require this Respondent to establish a third regular station between Hallandale and Fulford, the distance between Hallandale and Fulford being only about four miles; that this Respondent proposes to continue the non-agency station at Ojus and every year during the shipping season during the months of February, March, April and May, at Ojus to place a temporary agent there; but insists that the facts herein set forth show that it is unreasonable and unjust to require a regular agent there during the remaining 8 months of the year and to impose upon this Respondent a large additional permanent investment and a large additional annual expenditure for the maintenance of another regular agency station.

"And further answering this Respondent says that the freight business at Ojus is fluctuating, uncertain and dependent largely upon climatic conditions, as shown by the freight earnings hereinbefore set forth and the Exhibits attached; and that the passenger traffic is also largely fluctuating, as shown by the earnings hereinbefore set forth and the Exhibits attached.

"And further answering this Respondent says that, under and by virtue of the orders emanating from the Relators (the Railroad Commissioners of Florida), it has already been forced to construct regular agency stations unreasonably close to each other; that it has heretofore submitted to these orders, after protesting against them, to avoid litigation with the Relators (the Railroad Commissioners of Florida) and to comply as much as possible with the rules and orders of the Relators; that these stations are now so multiplied in close proximity

to each other as to already hinder and delay the movements and operations of trains, some of these regular agency stations being already closer to each other than the average distance between regular agency stations on the Pennsylvania Railroad where the population and business are enormously greater than on the line of the Respondent, the average population on which, according to the census of 1910, being but a trifle over 9 persons to the mile; that, by reason of the orders of the Relators (the Florida Railroad Commissioners) heretofore made establishing regular agency stations on the line of this road, the investment, expense and the annual expenditures of the road have been increased already 'so unreaosnably out of proportion to the convenience afforded to the public as to impose an unlawful burden' on this company, and that the proximity of a regular agency station at Fulford, only 1.8 miles from Ojus, and a regular agency station at Hallandale, only 2.8 miles from Ojus, affords to the public at Ojus all reasonable convenience, in addition to the facilities already afforded the public there, as hereinbefore set forth; and that to etsablish a regular agency station at Ojus in such close proximity to the regular agency stations at Fulford and Hallandale will be to impose upon this Respondent a burden out of proportion to any added convenience to the public at Ojus.

"And for answer to the 5th paragraph of the Alternative Writ this Respondent says that it is true that this Respondent has not obeyed the Order of the said Commissioners because this Respondent says that said Order is unjust, unreasonable and oppressive; that it was made without evidence as to the necessity for the establishing of a regular agency station at Ojus, or, if any evidence was taken, it was taken ex parte and the witnesses were

seen, or written received without this Respondent having an opportunity to confront and cross-examine said witnesses, or to rebut their testimony, or to examine any written testimony or address cross-interrogatories to those giving the written testimony; and that throughout the proceedings this Respondent was deprived of its Constitutional right of due process of law and in disregard of the decisions of this Court.

"And further answering the 5th paragraph this Respondent says that the financial condition of the Florida East Coast Railway does not warrant the expenditure necessary to establish a regular station agency at Ojus or the annual fixed charges necessarily following 'the establishment of such agency; that the Florida East Coast Railway Company never has and it is not now earning a reasonable profit on its investment.

"And further answering this Respondent says that, while in previous years there has been only a small increase in the freight business but a good increase in its passenger business, for the fiscal year ending June 30, 1915, the passenger traffic of this Respondent decreased $170,614.78 and the freight business increased $142,-915.64; the aggregate gross business being $4,863.54 less than the previous year; and, as heretofore stated, nothing but the most drastic economies practiced during the fiscal year ending June 30, 1915, enabled this Respondent to show an increase of gross profits; and, as heretofore and hereinafter stated, this limitation of expense cannot continue; that, on the contrary, the expenditures are likely to increase while there is no immediate prospect for any large increase in the gross business of the Company.

"And the Respondent further answering says that its total earnings and total expenditures for the fiscal year ending June 30, 1911, were as follows:

Gross earnings _____$4,181,277.80
Expenses, less taxes, interest and other
    charges _____ 2,603,710.19

Net earnings _____$1,577,567.61
Interest, taxes and other charges _____ 1,510,437.78

    Surplus _____$    67,129.83

"And of this small surplus over $25,000 was from interest received on deposits, and was not money received from the operation of the road.

"And the Florida East Coast Railway Company, the Respondent, further answering, says that of the $1,510,-437.78 expended for interest, taxes and other charges, $1,295,000 was paid in interest, to-wit:   4½% on its first mortgage bonds and 4% on its second mortgage, or income bonds, the balance, to-wit:   $215,437.78 representing taxes, hire of equipment and other necessary expenditures.

"And this Respondent further answering says that its total earnings for the fiscal year ending June 30, 1914, had increased to $5,334,653.08, and its gross expenses, including taxes, hire of equipment and rentals, amounted to $4,074,439.70, showing an increase of gross earnings over 1911 of $1,153,375.28, while the total expenditures of 1914 had increased over the expenditures of 1911, $1,188,784.04, or a decline of net earnings of $35,408.76; that during the fiscal years ending June 30, 1912-1913-1914, the net earnings averaged somewhat less than $1,-100,000 per annum, applicable to payment  of interest and dividends on stock, being less than the net earnings during the fiscal year ending June 30, 1911, showing that the increase of expenditures during these three years has

been greater than the increase of business during the same years.

"And this Respondent further answering says that its total earnings for the fiscal year ending June 30, 1915, were $5,392,782.32, showing a decrease from the total earnings for the fiscal year ending June 30, 1914, of $4,-863.54. By reason of the most drastic economy the operating expenses were reduced from $3,716,213.73 for the year ending June 30, 1914, to $3,337,336.36 for the year ending June 30, 1915. In addition the Water Line Transportation operated for the year showed a profit of $40,000.85, making a total income of $2,094,946.81. From this, however, must be deducted $1,881,627.47 for taxes, uncollectible railway revenue, hire of equipment, joint facility rents, miscellaneous rents, interest on funded debt, interest on car trust certificates, etc., leaving only $213,319.34 applicable to dividends on stock.

"This Respondent further says that the actual net earnings applicable to payment of interest on bonds and dividends on stock amounted to $1,753,319.34, or about 3½% on the capital invested in the company and less than 3% on the present value of Respondent's property.

"And this Respondent says that the Respondent has not yet earned a reasonable profit on its investment. This Respondent further says that the very limit of economy has been reached and that, unless the business of the Company shall largely increase during the present fiscal year, it is improbable that this Respondent will be able to earn as much as it did during the fiscal year ending June 30, 1915.

"A copy of the earnings, expenses, etc., for the fiscal year ending June 30, 1915, with a comparison with the earnings, expenses, etc., for the fiscal year ending June 30, 1914, is hereto annexed marked Exhibit '14' and

this Respondent prays that it may be taken as part of this Return.

"And further answering this Respondent says that the property of this Respondent represents an investment of over $50,000,000 and the present value of its property is over $50,000,000; that it has outstanding $12,000,000 of first mortgage bonds upon which interest at the rate of 4½% per annum is paid; that it has outstanding $25,-000,000 of second mortgage, or income bonds, the interest on which is limited by the terms of the mortgage to 5% per annum, and the interest on which was fixed by the Board of Directors at 4% per annum, but on which for the three successive years of 1912, 1913 and 1914, only a 2½% interest per annum has been paid; that for the fiscal year ending June 30, 1915, the Respondent, because of economies in the operation of the road, has been able to pay 4% on the second mortgage bonds, but during a period of four years past the average interest on these bonds has been less than 3% per annum; that it also has outstanding $400,000 of Car Trust Certificates bearing interest at 5% per annum, principal payable annually in sums of $50,000 during eight successive years; that it has in addition $10,000,000 of common stock outstanding on which no dividends whatsoever are or have been paid; that all of these bonds and stocks have been sold and paid for at par.

"And the Respondent further answering says that the small surplus is utterly inadequate to meet extraordinary contingencies; that it has no sinking fund of any kind; that it is compelled to keep up its railroad and equipment to the highest standard of condition; that, under the decision of this Court, now on Writ of Error to the Supreme Court of the United States, this Respondent is threatened with a further reduction of revenue aggre-

gating $20,000 per annum, by order of the Relators (the Railroad Commissioners of Florida) abolishing the arbitrary of 5c across the bridges at Palatka and Jacksonville; and that this Respondent is threatened with a further reduction of $50,000 per annum by the order of the Relators (the Railroad Commissioners of Florida) amending Rule 19, which Order was sustained by this Court and now on Writ of Error before the United States Supreme Court; that, in addition to this, under the law and under the orders of the Florida Railroad Commission and the Interstate Commerce Commission, this Respondent is required to make large increases of expenditures; that the freight produced on its line of road consists principally of fruit and vegetables which fluctuate greatly in volume and cannot be depended upon for any regular or steady income; that there is no cotton, phosphate or kaolin produced on the line of this Respondent's road; that its lumber business is purely local, and that its business in naval stores is very small; that the other principal railroads in the State of Florida transport more fruit and vegetables than this Respondent's road transports; that the tonnage per mile of the two principal roads is much greater than that of this Respondent's road, as shown by the following comparison, as officially submitted under oath to the Railroad Commissioners of Florida, for the fiscal year ending June 30, 1911:

*Comparison of Freights.*

Perishable High-rate Freight.          Whole Tons.

Florida East Coast Railway, fruits and vegetables _____ 124,892
Atlantic Coast Line, fruits and vegetables____ 249,111
Seaboard Air Line, fruits and vegetables _____ 216,120

*Dead Freight Produced in Florida.*

Florida East Coast, lumber, naval stores and
   forest products _____ 122,451
Atlantic Coast Line, lumber, naval stores, forest
   products, phosphate and other mining prod-
   ucts, and cotton _____2,686,624
Seaboard Air Line Railway, lumber, naval
   stores, forest products, phosphate and other
   mining products, and cotton _____1,916,342

"The tremendous discrepancy between the roads in
this regard is to be seen from the following compari-
son of freight:
Florida East Coast, produced on line of road    247,343
Atlantic Coast Line,        "       "       "    2,935,735
Seaboard Air Line,          "       "       "    2,132,462
"We have excluded the Southern Railway from these
comparisons because this road has little or no mileage
in the State of Florida.   In its most important run it
uses the tracks of the Atlantic Coast Line and the Sea-
board Air Line Railway to find access into Jacksonville.

"The mileage of the Atlantic Coast Line Railroad in
Florida is less than four times that of the Florida East
Coast Railway, and that of the Seaboard Air Line Rail-
way in Florida is less than three times that of the Florida
East Coast Railway, while the Atlantic Coast Line Railroad
in Florida handles more than five times the entire tonnage
of the Florida East Coast Railway and the Seaboard Air
Line Railway in Florida handles 3¾ more than the
entire tonnage of the Florida East Coast Railway.   The
aggregate tonnage of each road on all freights handled
in Florida, whether produced on the line of road or not,
for the fiscal year ending June 30, 1911, is as follows:

Florida East Coast Railway _____    787,658
Seaboard Air Line Railway _____ 2,830,088
Atlantic Coast Line Railroad Company ____ 4,087,839

"And this Respondent further answering says that the mileage of the other main roads in this State continues largely in excess of that of the Florida East Coast Railway and that the population on the line of the Florida East Coast Railway is much less per mile than that on the other principal railroads in this State; that at the time of filing this return this Respondent has not received a later statement of the traffic of the Atlantic Coast Line Railroad and the Seaboard Air Line Railway, but that it still continues per ton mile largely in excess of this Respondent's line of road, notwithstanding the depression in lumber, naval stores and phosphate business, caused by the existence of the war in Europe.

"And further answering this Respondent says that it operates its road as economically in every way as is possible, with due regard to the safety of property and passengers; that it pays no higher wages to its employes than it is compelled to pay for the services of competent and experienced men; that it purchases supplies and equipment at the lowest possible prices commensurate with the kind and quality it is compelled to have in the transaction of its business; that it has never yet earned a reasonable compensation for the many millions of dollars invested in its road; that it has reached the limit of economy in expenditures and that, unless its earnings increase during the present fiscal year in proportion to the necessary increase of its expenditures hereafter, it will not be able to pay as much interest on its second mortgage bonds as it has paid during the last fiscal year; that its increase of freight business has been largely due

to the extension to Key West in freights shipped to and from Cuba; that, on account of competition with ocean steamers, this freight is necessarily carried at only a fraction over the cost of transporting it.

"And further answering this Respondent repeats that it is unjust and unreasonable to require it to establish a regular agency station at Ojus; that there does not exist any necessity for establishing such an agency at this place; that the passengers and shippers and receivers of freight are served promptly and efficiently; that there are no delays either in the receipt or transmission of freight and no just cause whatsoever for any complaint as to the transaction of business at Ojus; that all persons desiring to transact business with a regular agent can always find one at Fulford, 1.8 miles from Ojus, or at Hallandale, a fraction over 2 miles from Ojus.

"The premises considered and having fully answered all the allegations of the Alternative Writ and standing ready to prove all and every the allegations of this answer, the Respondent prays that said Alternative Writ be dismissed with its costs."

We omit the exhibits attached to the return.

To this return the following demurrer was interposed:

"The Relators, by their attorney, demur to the return filed by the respondent and say that the same is bad in substance.

"GROUNDS OF DEMURRER.

"1. The return does not show that the order of the Railroad Commissioners, on which this suit is based, was unreasonable and unjust.

"2.   The return does not show that respondent was deprived of any constitutional right.

"3.   The fact that no witnesses were examined by the Railroad Commissioners does not warrant the conclusion that there was no evidence before them as to the necessity for an agency at Ojus.

"4.   The return does not show that there was no evidence before the Commissioners.

"5.   The return shows on its face that the Commissioners had evidence before them in the shape of the sworn answer of the company giving the amount of earnings from this station.

"6.   The fact that if an agency is installed at Ojus * * * it will result in a pecuniary loss to respondent does not give rise to a conclusion of unreasonableness in the order requiring such facilities.

"7.   An order requiring facilities at a station, which is not otherwise unreasonable, must be complied with even if it results in a pecuniary loss to respondent.

"8.   If the facilities required are in fact necessary they must be supplied even if by so doing respondent will thereby incur a loss.

"9.   The fact that respondent has not been able to pay a reasonable rate of interest on its outstanding bonds and other obligations does not excuse it from the performance of a duty which is reasonably necessary for the comfort and convenience of its patrons.

"10.   Inquiry into the necessity for an agency at Ojus is an administrative function.   The question as to the necessity for an agency is concluded by the action of the Commissioners which finds that an agency is in fact necessary.

"11.   It does not appear from the return that compliance with the order will impose burdens on respond-

ent so out of proportion to the benefits to be derived therefrom by the public as to render the order arbitrary and unreasonable.

"12.  The return shows that the business at said station is large and increasing; that respondent voluntarily established an agency there during certain months of the past year.

"13.  The return presents no valid defense to the writ."

At the same time the relators filed their motion to strike certain portions of the return.  We see no occasion for setting out this motion.  It is sufficient to say that it is addressed practically to the entire return, at least to the material parts thereof, and seeks to reach the same matter and accomplish the same result as is sought by the demurrer.

It is contended by the respondent that the instant case is ruled by the case of State *ex rel.* Railroad Commissioners v. Florida East Coast Railway Co., 69 Fla. 165, 67 South. Rep. 906.  There is a difference of opinion among the members of the court as to whether or not we can say in the instant case, as a majority of the court held in the cited case, that "it appears in the return of the respondent which was demurred to by the relators that no testimony was taken by the Railroad Commissioners to show any necessity for the establishment of such agency, that no witnesses were examined, that there was no evidence before the Commissioners of any delay on the part of the respondent in handling, receiving or delivering freight at the said point, and that the order was made without evidence as to the necessity for establishing such an agency."  It may be that as to the return in the instant case showing that no testimony was taken by the Railroad Commissioners, that no witnesses were ex-

amined and that there was no evidence before the Commissioners of any kind as to the necessity for establishing an agency station the instant case can be differentiated from the cited case. Be that as it may. We are of the opinion that there is no necessity for discussing and deciding this point. We think that the matters of fact set out in the return in the instant case make a stronger showing in favor of the respondent than was made by the return in the cited case. It is elementary that a demurrer to a pleading admits the truth of all such matters of fact as are sufficiently pleaded. It is clearly and distinctly set forth in the return that the respondent has an agency station at Hallandale, "situated a trifle more than two miles from Ojus," and another "agency station at Fulford, only 1.8 miles from Ojus." It further appears from the return that the principal amount of business transacted at Ojus is during a period of four months, during which time the respondent kept and maintained a "temporary agent" at such station. It also further appears from the return that a large portion of the business credited to the station of Ojus consists of rock, which "rock shipments are handled from the Ojus Rock Pit Spur, some six-tenths of a mile from Ojus station on conductors' way-bills and at estimated weights and that it is not necessary that an agency station be established at Ojus for the convenience of shipments of rock, because, even if there was an agent established at Ojus, it would be necessary, for the prompt and efficient operation of this company's freight trains, to still receive and handle this rock at the Ojus Rock Pit Spur and to ship the same on conductors' way-bills."

In other words, we are of the opinion that the matters of fact set out in the return, which we have copied above, and admitted to be true by the demurrer, show

that the order is unreasonable and that no necessity exists for the establishment of an agency station at Ojus, as required by the order of the Railroad Commissioners, which we have copied above. In this respect we think that the principles enunciated in the cited case, which we shall not repeat here, are controlling.

It necessarily follows that the demurrer and motion to strike are overruled, with leave to the relators to join issue upon the averments of the return, as they may be advised.

TAYLOR, C. J. and COCKRELL, WHITFIELD and ELLIS, JJ., concur.

WHITFIELD, J. (*concurring*)—The statute confers upon the Railroad Commissioners authority to "require the erection of such freight and passenger depots, etc., with all necessary conveniences as the safety, convenience and comfort of passengers and the proper handling, care, protection and prompt delivery of and transportation of freight may require. Subdivision 5, Section 3, Chapter 6527 Acts of 1913, Sec. 2893 Compiled Laws of 1914. Authority to make an order in the premises appearing, the question to be determined is whether the order as made is enforceable by mandamus. Orders made by the Railroad Commissioners within their statutory authority are as a matter of organic law not conclusive. If such an order is made without a legally sufficient evidentiary basis to support it, the order is not enforceable. See Seaboard Air Line Ry. v. Railroad Commission of Georgia, 240 U. S. 324, 36 Sup. Ct. Rep. 260; Wisconsin M. & P. R. Co. v. Jacobson, 179 U. S. 287, 21 Sup. Ct. Rep. 115; State of Washington *ex rel.* Oregon R. & Navigation Co. v. Railroad Commis-

sioners of State of Washington, 224 U. S. 510, 32 Sup. Ct. Rep. 535; Great Northern Ry. Co. v. State of Minnesota *ex rel.* State Railroad & Warehouse Commission, 238 U. S. 340, 35 Sup. Ct. Rep. 753; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U. S. 88, text 91, 92, 33 Sup. Ct. Rep. 185; Florida East Coast Ry. Co. v. United States, 234 U. S. 167, text 185, 34 Sup. Ct. Rep. 867; Louisville & N. R. Co. v. United States, 238 U. S. 1, 35 Sup. Ct. Rep. 696; Interstate Commerce Commission v. Great Northern R. Co., 222 U. S. 541, 32 Sup. Ct. Rep. 108; State *ex rel.* R. R. Comm'rs v. Florida East Coast R. Co., 64 Fla. 112, 59 South. Rep. 385; State *ex rel.,* Railroad Commissioners v. Florida East Coast Ry. Co., 69 Fla. 165, 67 South. Rep. 906.

Under the statute all presumptions are in favor of the action taken by the Commissioners, and the order made by them "shall be deemed and held to be reasonable and just and such as ought to have been made in the premises and to have been properly arrived at in due form of procedure and such as can and ought to be executed, unless the contrary plainly appears on the face thereof or be made to appear by clear and satisfactory evidence, and shall not be set aside or held invalid unless the contrary so appears." This statutory provision apparently extends the inquiry in proceedings of this character to errors in making orders, whereas prior to the enactment of the statute the enquiry was confined to questions of exceeding statutory powers and to abuses of authority, questions of mere error not being considered. State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 67 Fla. 83, 64 South. Rep. 443.

In view of the above quoted statute if it be made to appear by admissions in the pleadings having the effect

of "clear and satisfactory evidence," that the order in this case is not "reasonable and just," or that the order is not "such as ought to have been made in the premises," or that the order was not "properly arrived at in due form of procedure" or that the order is not "such as can and ought to be executed," the order should not be enforced by mandamus. If the order is in whole and in every part thereof invalid or unenforceable, it should not be enforced either wholly or partially; and the provision of the statute to the effect that if any part of the order "shall be found invalid, the court shall proceed to enforce such portion thereof as may be valid if the same can be done," can have no application.

To afford *reasonably adequate* facilities at its own stations is primary duty of the carrier, and the burden of furnishing such facilities does not unlawfully invade the carrier's property rights, *when* the requirements are not in fact *unreasonable* and *arbitrary*.

While the duty of furnishing reasonably adequate depot facilities may be enforced, the nature and extent of facilities required to be furnished should be determined after a due consideration of all pertinent facts, including the expense to the carrier and the relative benefits to the public to be served. State *ex rel.* Burr v. Atlantic Coast Line R. Co. 71 Fla. 102, 70 South. Rep. 941.

In determining the validity and reasonableness of an order requiring depot facilities to be furnished, regard should be had for considerations that show whether the facilities may justly be required for the convenience and safety of the public to be served, and whether the expense to the carrier is so out of proportion to the advantage thereby afforded to the public or so affects its earnings as to impose an unlawful burden upon the carrier. See State *ex rel.* Railroad Commissioners v. Florida

East Coast Ry. Co., 69 Fla. 165, 67 South. Rep. 906. When it does not clearly appear that the order is unreasonable as to the nature or extent of the facilities required or as to the expense involved, and the order is otherwise valid, it will be enforced, and doubts if any will be resolved in favor of the order. State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 67 Fla. 83, 64 South. Rep. 443. It is within the province and duty of the Railroad Commissioners and the carrier to anticipate and provide for the *reasonable* requirements by prospective growth of the business done by the carrier. State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 67 Fla. 83, text 101, 64 South. Rep. 443; Louisville & N. R. Co. v. Railroad Comm'rs, 63 Fla. 491, 58 South. Rep. 543.

But where an order requiring depot facilities to be furnished is shown by the admissions of the pleadings to be so unreasonable with reference to the past and present conditions affecting the matter as to unlawfully invade the carrier's property rights, the order should not be enforced by mandamus, particularly when it appears that the prospective growth of the carrier's business does not clearly warrant the requirements of the order sought to be enforced.

The functions of a demurrer to a return to an alternative writ of mandamus is to raise a question of law as to the right of the relator on the pleadings to the relief sought. All the allegations of fact that are, as a matter of pleading, sufficiently averred in the return, are for the purposes of the demurrer admitted to be true as averred. The law applicable to the facts duly stated and admitted is to be determined by the court; and the essential question, when properly presented, is whether the facts thus alleged and admitted are in law sufficient as a

defense to the writ.   State *ex rel.* Railroad Commissioners v. Louisville & N. R. Co., 62 Fla. 315, 57 South. Rep. 175; State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 64 Fla. 112, 59 South. Rep. 385; State *ex rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., 67 Fla. 441, 63 South. Rep. 729.

From the admissions of the demurrer herein as set out in the main opinion, it "plainly appears" as if shown "by clear and satisfactory evidence," that the order is not "reasonable and just," and is not "such as ought to have been made in the premises" and is not "such as can and ought to be executed;" therefore in accordance with the provisions of the statute the order should not be enforced.