THE STATE OF FLORIDA, *ex rel.* RAILROAD COMMISSIONERS, *Relators*, v. FLORIDA EAST COAST RAILWAY COMPANY, *Respondent.*

Opinion Filed Nov. 21, 1916.

1. In considering the reasonableness of a rate fixed by the Railroad Commissioners for the transportation of any particular class of freight, the question is whether the entire revenue produced from the particular traffic affords a substantial income for the service over the cost of rendering it.

380 SUPREME COURT OF FLORIDA,

State ex rel. R. R. Comrs. v. F. E. C. Ry. Co.—Syllabus

2. The orders of the Railroad Commissioners prescribing a rate to be charged by railroad corporations for the transportation of freight, being within the scope of the Railroad Commissioners' power, are prima facie reasonable and just, and properly made and arrived at in due form of procedure and such as ought to have been made in the premises.

3. Where the reasonableness of a rate fixed by the Railroad Commissioners for the transportation of a particular class of freight is attacked by the carrier, against whom it is sought to be enforced, upon the ground that the rate prescribed will require the carrier to perform a service without reasonable compensation therefor, or upon the ground that the order was made without any evidence to support it, the burden is upon the carrier to establish by evidence which is clear and satisfactory such ground of defence.

4. Upon the question of whether the Railroad Commissioners made an order relating to the carriage of freight by railroad carriers without any evidence before them upon which to base such order, they may be called as witnesses and required to testify whether in fact any evidence was submitted to and considered by them as the basis for such order.

5. Evidence examined and found not to clearly and satisfactorily show that the order made by the Railroad Commissioners affecting the carriage of commodities included in Class P traffic by the respondent railroad, would compel the respondent to carry such commodities at a loss or without substantial compensation.

6. In ascertaining the cost to or expense incurred by a railroad carrier in handling a particular class of traffic, interest on bonds and taxes should not be included in the estimate, but they are matters to be considered in determining whether the rate to be enforced provides a reasonable or fair compensation.

Original Proceedings in Mandamus.

Peremptory writ awarded.

VOL. 72, JUNE TERM, 1916.     381

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

. *D. C. McMullen,* for Relators;

*Alex. St. Clair-Abrams,* for Respondent.

ELLIS, J.—Upon the petition of the Railroad Commissioners an alternative writ of mandamus was issued by this court against the Florida East Coast Railway Company, requiring it to observe as its maximum rates the rates prescribed in a certain order of the Railroad Commissioners numbered 431, and to put into effect the rates prescribed in that order or rates not in excess thereof, and in all things to observe and comply with the order, or to appear before the Justices of this court at Tallahassee on a day named and show cause why it refuses to do so.

Order Numbered 431 as made by the Railroad Commissioners is an order prescribing rates to be charged by all railroads doing business wholly or in part within the State of Florida for the transportation between points in this State of freight classified as "Class P." Freight of this class embraces carload lots of certain commodities and weighing per car not more than a certain number of pounds as follows: "Bark, tan, 20,000 lbs; Barrel material, 24,000 lbs; Barrels, except Ale and Beer, 10,000 lbs; Baskets, fruit and berry, 15,000 lbs; Baskets, vegetable, 20,000 lbs; Box and Crate material, 24,000 lbs; Boxes, berry, fruit and vegetable, 15,000 lbs; Brick, common, 30,000 lbs; Vitrified brick, 24,000 lbs; Crossties, 24,000 lbs; Shells for paving, 30,000 lbs; Stone, building and building blocks, 30,000 lbs; Mouldings, common wooden, 24,000 lbs; Cups, turpentine, earthen, 24,000 lbs; Gravel, 30,000 lbs; Limestone, 30,000 lbs; Lumber, 24,000 lbs; Melons, water, 24,000 lbs; Moss,

green, 24,000 lbs; Poles, tel. and tel., 24,000 lbs; Posts, wooden, 24,000 lbs; Sand, 36,000 lbs; Sawdust ¾ of P. 24,000 lbs; Shingles, 24,000 lbs; Veneering, 24,000 lbs; Slag, 30,000 lbs;"

The order prescribed amounts to be charged on "Class P" freight hauled for a distance of five miles and under, and for that distance and greater to four hundred miles, a different amount being prescribed for each five or ten miles that the freight may be hauled.

The alternative writ alleged that the respondent railroad company was violating, disregarding and refusing to obey the order in that the company had not published and put into effect the rates prescribed in the order, but had continued to publish, charge and collect rates on articles embraced within Class P which are higher than those rates fixed by the order, and that the respondent company has declared its intention not to obey the order.

In the return to the alternative writ the respondent railroad company averred that "Order No. 431 was made by the Relators without the Relators having any evidence before them affecting or concerning the Florida' East Coast Railway Company upon which to base said Order No. 431." The return also contained the averment that the "said Order No. 431 is unjust, unreasonable and' oppressive; that if carried into effect it confiscates the property of the Respondent and compels it to transport freight of Class 'P' without just and reasonable compensation for the service."

The return contains many averments of fact in support of the conclusion averred as to the unjustness and unreasonableness of the order, and concludes with the averment that to enforce the order would be to inflict irreparable injury upon the Respondent and tend to deprive

VOL. 72, JUNE TERM, 1916.          383

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

it of just compensation for services rendered; that it would deprive the respondent of the equal protection of the laws, and due process of law.

The averments of fact in support of these conclusions are many. Among other things it is averred that the rates fixed by Order No. 431 are the lowest rates fixed in the United States on Class "P" freight, and if the order is enforced it will cause a large annual loss of revenue on intrastate business and an additional loss nearly six times greater on all interstate business embraced in Class "P" now done by the respondent. That Order No. 431 makes an approximate reduction of thirty per cent in the rates on the Class "P" freight from the rates now charged and collected by the respondent; that for the fiscal year ending June 30, 1914, the total earnings of respondent from Class "P" freight amounted to $379,157.06, of which $239,018.27 were derived from interstate freight of Class "P," and $40,138.79 from intrastate business. That based upon the earnings for the year ending June 30, 1914, Order No. 431 would have resulted in a loss of revenue to the respondent on interstate business in Class "P" of $71,705.48, and, on intrastate business of $12,-041.64 in that class, or a total of $83,747.12. That the rate imposed by the order is the same as that imposed upon the railroads of South Carolina and is considered by those roads to be unjust although the conditions in that State are more favorable for the maintenance of such rate than the conditions existing in the territory in Florida through which the respondent's road runs. Comparisons were made with the rates on such freight in North Carolina, Alabama and Georgia which were alleged to be higher than the rate fixed by the order. Also with the rates in the Central Freight Association territory North of the Ohio and East of the Mississippi Rivers where

384    SUPREME COURT OF FLORIDA,

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

the population is much greater than in Florida per mile; that the rates now in force on respondent's road are too low and are out of proportion to the rates allowed on other classes of intrastate freight; that the entire population in the counties through which the respondent road runs as shown by the United States census of 1910 aggregates 147,250, and that Duval county with a population of 75,163 affords but little local business to respondent and is practically only a receiving and delivery point; and that the population per square mile in the territory through which the respondent's road runs is much smaller than the population on the lines of the Atlantic Coast Line Railroad and the Seaboard Air Line Railway. The return alleges that it filed with the relators in answer to the citation full advice and information as to the condition of the respondent's road and "the unreasonably low rates sought to be enforced on it;" that the rates now in force on the road on Class "P" were held by the relators to be just in 1910 and the business has not changed since to render the rates unreasonably high, but have been such to require an advance; that the principal commodity hauled by respondent in Class "P" is crate material invariably loaded at the minimum of 24,000 lbs.; that the present rate on such material from Miami to Jacksonville is $33.00 per car, but that the proposed rate is $22.50, or a reduction of 33% from the present charge. Comparisons in other materials were also made, showing corresponding reductions. That the principal commodities moving in Florida under Class "P" are timber, lumber, crate material and phosphate, and that the respondent does not transport any phosphate rock and only a comparatively small amount of lumber and timber and only in carload lots for local purposes. That in November,

VOL. 72, JUNE TERM, 1916.        385

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

1910, the respondent voluntarily made reductions on all classes of freight, including fruits and vegetables, by reason of which it suffered a loss of about $81,000.00 from fruits and vegetables alone; that respondent's expenses have greatly increased so that for the years 1912 and 1913 they largely exceeded the increase of its business. The return fully set out the total earnings and expenses of the respondent road for the years ending June 30, 1911, 1912, 1913 and 1914, which showed an increase yearly in net earnings, but as it was alleged insufficient to pay 3% on the present investment in the property, and not that amount on the present value. That for the years 1912, 1913 and 1914, the respondent expended for betterments nearly two million dollars on its line from Homestead to Jacksonville and branches. That the property of the respondent represents an investment of over $47,000,000.00, and the present value of the property is greater; that there are outstanding $12,000,000.00 of first mortgage bonds, $25,000,000.00 of second mortgage bonds, and $10,000,000.00 of common stock, all of which has been purchased and paid for at par; that although the interest on the second mortgage bonds was fixed at 4% the respondent has been unable to pay more than 2½ or 3%, and has not paid any dividend on the stock; that the small surplus shown from the respondent's earnings is insufficient to meet extraordinary expenses; that it has no sinking fund of any kind; that it keeps its road and equipment up to the highest standard of condition; that nearly half of its gross receipts is derived from its passenger trains which afford little or no profit in their operation and relators are endeavoring to reduce still further respondent's passenger rates to and of over $20,000.00 per annum and otherwise endeavoring to require respondent to increase its expenditures;

that the aggregate reductions now sought to be made will, *if* the interstate rates are further reduced, involve the respondents in an aggregate loss of over $500,000.00 of revenue annually and reduce its net earnings on the present value of its property to less than $1\frac{1}{2}\%$ per annum. Comparisons were made between the respondent's financial condition and that of the other two named railroads in this State and the freight hauled of Class "P;" that if Order 431 is enforced against respondent it will under a decision of the Supreme Court of the United States be compelled to reduce its charges on interstate business of the same class and will entail a loss in revenue as above stated. That all these matters were submitted to the relators at the hearing when they had under consideration the said Order No. 431.

The return nowhere averred specifically that the receipts derived by the respondent from its Class "P" traffic were less than the expense or cost to the respondent of handling such traffic; nor that such expense was equal to such receipts; nor were any figures given in the return to show the cost to respondent of handling its Class "P" traffic on the one hand and the revenue derived from such traffic on the other. It is therefore impossible to ascertain from the return whether the enforcement of Order No. 431 would compel the respondent to transport the commodities thus segregated and classed as "Class P" freight for less than the proper cost of transportation or virtually at cost. Order No. 431 dealing only with the rate to be charged on a particular class of freight, the question whether the total earnings afford a reasonable return is not material and therefore not involved, because if the total income of the carrier enabled it to declare a dividend, that would not justify

VOL. 72, JUNE TERM, 1916.          387

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

an order requiring it to carry one class of freight for nothing or for less than a reasonable rate. On the other hand if the carrier earned no dividend the Railroad Commissioners would not be warranted, nor would the corporation be justified in making an order or fixing a rate unreasonably high on any one class. Northern Pacific R. Co. v. North Dakota, 236 U. S. 585, text 600, 35 Sup. Ct. Rep. 429; Southern Ry. Co. v. St. Louis H. & G. Co., 214 U. S. 297, text 301, 29 Sup. Ct. Rep. 678; Wood v. Vandalia R. Co., 231 U. S. 1, 34 Sup. Ct. Rep. 7; Louisville & N. R. Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. Rep. 48; Louisville & N. R. Co. v. Finn, 235 U. S. 601, text 607, 37 Sup. Ct. Rep. 146. The return however did contain one paragraph in which it was averred "That said Order No. 431 is unjust, unreasonable and oppressive; that if carried into effect it confiscates the property of this respondent and compels it to transport *freight of Class* P without just and reasonable compensation for the service."

The demurrer of relators to the return and their motion to quash were overruled and denied because if the above averment was true, the rate sought to be enforced by the order would compel the respondent to carry Class "P" freight at a confiscatory rate; that is to say it would compel the respondent to perform a service for nothing, or for less than a reasonable rate. This averment was regarded as an averment of an ultimate fact.

The replication filed by the relators denied that there was any agreement between them and the respondent that there should be no further reductions of rates on its line for a number of years as was averred in the return, and denied every material allegation contained therein.

After the evidence was taken respondent was permitted to amend its return by adding a paragraph averring that Order No. 431 was made by relators without any evidence before them affecting or concerning the Florida East Coast Railway Company, as quoted earlier in this opinion.

A great deal of evidence was taken upon the issues made comprising seven large volumes of typewritten matter and one large volume of exhibits consisting of tabulated figures, plats and blue prints of respondent's railroad and terminals.

Much of this evidence throws little if any light upon the issue and the briefs of counsel which exhibit considerable industry in analyzing the testimony of certain witnesses and the citation of decisions have not dealt clearly with the question which the court has been compelled to consider and the evidence affecting which it has been required to exhume from the overwhelming mass of irrelevant matter

Section 30 of Article XVI of the State Constitution ordains that "The legislature is invested with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, or performing other services of a public nature."

Sections 2888 and 2889 of the General Statutes of Florida, 1906, Florida Compiled Laws 1914, forbids any railroad, railroad company or common carrier to "charge, collect, demand or receive more than a fair reasonable rate of toll or compensation for the transportation of passengers or freight of any description or for the use and transportation of any railroad car upon its tracks

or any of the branches thereof, or upon any railroad within this State which it has the right, license or permission to use, operate or control," and forbids it to make any "unjust discrimination in its rates or charges of toll, or compensation for the transportation of passengers or freight of any description, or for the use and transportation of any railroad car," &c.

Section 2893 of the General Statutes of Florida, 1906, as amended by Chapter 6527 Laws of Florida, 1913, Florida Compiled Laws, 1914, provides, among other things, that it shall be the duty of the Railroad Commissioners: "1. To make reasonable and just rates of freight and passenger tariffs to be observed by all railroads, railroad companies and common carriers doing business in this State over their respective lines." "3. To make reasonable and just rates of charges for the use and transportation of all kinds of railroad cars conveying all kinds of freight to and from all points in this State;" "4. To make reasonable and just rules and regulations for the prevention of any unjust discrimination against persons or localities in charges or in furnishing facilities;" and "13. To prescribe all rules and regulations appropriate for the execution of any of the powers conferred upon them by law either in express terms or by implication. All rules and regulations made and prescribed by the Commissioners shall be made prima facie evidence in the manner that the schedules are made prima facie evidence. Every rule, regulation, schedule or order heretofore or hereafter made by the Commissioners shall be deemed and held to be within their jurisdiction and their powers, and to be reasonable and just and such as ought to have been made in the premises and to have been properly made and ar-

rived at in due form of procedure and such as can and ought to be executed, unless the contrary plainly appears on the face thereof or be made to appear by clear and satisfactory evidence, and shall not be set aside or held invalid unless the contrary so appears. All presumptions shall be in favor of every action of the Commissioners and all doubts as to their jurisdiction and powers shall be resolved in their favor, it being intended that the laws relative to the Railroad Commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest. If in any proceeding to enforce any rule, regulation, schedule or order any part thereof shall be found invalid, the court shall proceed to enforce such portion thereof as may be valid if the same can be done."

In the case of State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 64 Fla. 112, 59 South. Rep. 385, this court speaking through Mr. Chief Justice WHITFIELD, said: "That until the contrary appears, it will be presumed that in making an order or regulation the Railroad Commissioners acted not arbitrarily, but upon full hearing, or after giving all interested parties a reasonable opportunity to be heard and upon appropriate evidence duly considered and properly applied." In the case of State *ex rel.* Railroad Commissioners· v. Florida East Coast R. Co., 69 Fla. 473, 68 South. Rep. 727, this court said: "It is incumbent upon the carrier to show by convincing evidence that the service required in the entire traffic to which the order applies would under the order be rendered without just compensation, by showing the cost of respondent's entire intrastate passenger service, the receipts therefrom, the value of the property properly apportioned to and devoted to in-

VOL. 72, JUNE TERM, 1916. 391

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

trastate traffic and the practical effect of applying the order." The order involved in that case affected the respondent's charges, in the form of "extra compensation" for the transportation of intrastate passengers over the carrier's bridges across the St. Johns River at Jacksonville and at Palatka. The court held that conceding extra expenses were incurred in maintaining and operating the bridges, that alone did not show the order to be illegal when the receipts and expenses of the entire traffic to which the order applied and the value of the property used in rendering the intrastate service were not shown. In the case of State *ex rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., 64 Fla. 469, 60 South. Rep. 186, the court said: "In determining whether a regulation of the Railroad Commissioners is so unreasonable and arbitrary as to be illegal and unenforceable, the courts in deference to the governmental functions conferred by law upon the Commissioners, will not only require the *prima facies* of reasonableness impressed by the statute upon the regulation to be overcome by admissions or proofs, but will require the admission or proofs of unreasonableness to be clear and convincing, every reasonable doubt being yielded in favor of the regulation." See State *ex rel.* Railroad Commissioners v. Louisville & N. R. Co. and Seaboard Air Line Railway, 62 Fla. 315, text 359, 57 South. Rep. 175. In these cases the court was considering the effect of the evidence submitted in its bearing upon the reasonableness of the order, and not the power of the Railroad Commissioners to exercise a particular function as was involved in the case of State *ex rel.* Burr v. Jacksonville Terminal Co., 71 Fla. 295, 71 South. Rep. 474.

It was therefore incumbent upon the respondent in this case to make it appear by clear and satisfactory evi-

dence that Order No. 431 was not "properly made and arrived at in due form of procedure," or that it was made without evidence to support it, or indisputably contrary to the evidence, or that in its operation upon the respondent the order will deprive respondent of property rights secured by the constitution and is not "reasonable and just" and ought not to have been made in the premises. If the respondent has failed to thus clearly and satisfactorily make it appear that the relators have exceeded their authority in their effort to apply the order to the respondent corporation the return should· be deemed to be unsustained, the order to be valid and enforceable and the peremptory writ should issue.

As to the averment in the return that Order No. 431 was made without any evidence before the Railroad Commissioners affecting or concerning the Florida East Coast Railway Company, we think it has not been sustained. Aside from the presumption of law that the order was properly made and arrived at in due form of procedure and was reasonable and just and, such as ought to have been made, the return admits that the respondent was represented at the hearing at which the propriety of the order was considered and that all the "matters and things" set forth in the return, "as to the condition of the road, its earnings, the value of its property and the small earnings made by it (except those which have arisen since) were presented to the Railroad Commissioners." The testimony of Mr. R. Hudson Burr, called as a witness for respondent, shows that the relators had before them the reports of the railroad companies, including that made by respondent, required by law to be made, for the years 1910, 1911, 1912 and 1913. That examination showed the "percentage of total freight tonnage for the year 1910" of the respondent's

VOL. 72, JUNE TERM, 1916.    393

State ex rel. R. R. Comrs. F. E. C. Ry. Co.—Opinion of Court

road was 11.32 per cent., for 1911, 11.02 per cent., for 1912, 19.91 per cent., and for 1913, 20.13 per cent. The relators had before them many witnesses, mill men, lumber men and representatives of an organization known as the Georgia-Florida Sawmill Association, representing about seventy sawmills, the written answer of respondent prepared and sent by it for consideration by relators. The matter was set down for a general hearing in order that every railroad and every person interested in the State could be present and heard. According to the witness the relators "heard everybody that desired to be heard." The record does not disclose the evidence that the relators had before them, although it was shown that they did not by any analysis of the movement of Class P. freight ascertain what it cost the respondent to handle that particular class of freight. While it is doubtless possible for that fact to have been ascertained definitely with a high degree of accuracy, it is true that such a calculation would involve a prodigious labor, a most careful examination of all accounts and to a large degree an arbitrary division and apportionment of the expenses of maintenance and operation which are divided into and distributed through some hundred or more subsidiary accounts. Such a labor seems not to have been considered necessary by the legislature in creating the Railroad Commission and the provisions made for its maintenance. It would entail the employment of a large force of clerks and expert railroad accountants, it would entail delays in the making of rates which would be expensive alike to the people and the railroads, for whether a proposed rate was higher or lower than the existing one the same investigation contended for by respondents would have to be made; it would require an appropriation of public money by the legislature be-

yond the benefits to be derived by the people from the regulation of the public utility and would so handicap the administration of the raliroad commission law as to render it practically inefficient and nugatory.

The intention of the statute and the reason of the law in making the orders of the Railroad Commissioners only *prima facie* reasonable and just, was that the judgment of the Railroad Commissioners upon the facts before them could not in practice, in reason and fairness be conclusive of the truth and as in the nature of things the railroad companies are in possession of all the facts relating to the maintenance and operation of their respective railroads and therefore in better position to know the truth concerning the management of the business, they can more readily and with less difficulty and very much less expense show clearly the unreasonableness of any order containing that element of illegality. While it is necessary for the Railroad Commissioners to have some evidence before them germane to the subject under investigation, so that the order made may be said to reflect the judgment of the Commissioners, it by no means follows that the test of legality of such an order is the legal sufficiency in quality or quantity of the evidence on which it rests.

We think that the principle here announced is practical in its application and just in its effect. The Railroad Commissioners recognized it and acted upon it in the making of Order No. 431 and applying it to the respondent road as shown by the testimony of Mr. Burr in the following question and answer: "Q. What evidence affecting the Florida East Coast did you have before you at that investigation or hearing upon which you based Order No. 431 requiring the Florida East Coast Railway to put those rates in force that are now issued?"

"A. We didn't have a witness, as I have already stated residing on your line before us. We had information, that I referred to heretofore, in this audit, and what your annual report showed us and as I also stated yesterday we believed that there was not enough difference in the character of the operation of the several roads to make a difference in the Class P rates and of course, it is unnecessary, I suppose to repeat it, because the testimony shows it, that we believed that those rates would be just if we did not have to include the East Coast extension south of Homestead in as a basis to make them. I have said that already two or three times."

This court said in State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 69 Fla. 165, 67 South. Rep. 906: "The Railroad Commission Act of the State and the amendments thereto contemplate that the Commissioners shall inquire into the necessities which seemingly demand their attention and base their determination upon the evidence before them. If it is made to appear that these requirements of the statute were not observed, that the order was made without any evidence before the Commissioners in support of the necessity or propriety of it, or clearly contrary to the evidence, the order will be deemed to have been made without authority of law and therefore not possessing the status of *prima facie* reasonableness."

According to the evidence in this case the consideration of Order No. 431 extended through many years from 1905 to 1914, during which time officials of the respondent company appeared before the relators and "made statements at the hearings, officials of other roads were heard, analyses of Class P rates were made, witnesses testified and the annual reports of the various roads were on file before the Commissioners. All the

evidence that was heard and considered does not appear in this record, we therefore cannot say that the order was made without any evidence before the Commissioners, nor that it was clearly contrary to the evidence.

We have considered the testimony of the Railroad Commissioners, Mr. Burr, Mr. Blitch and Mr. Dunn, in this case, and overrule the point made by their attorney that it is contrary to public policy "that a Railroad Commissioner should be called as a witness to impeach their own orders." This court has said that although the law gives to administrative action the effect of *prima facie* reasonableness, the courts may enquire into the reasonableness of the action. State *ex rel.* Railroad Commissioners v. Florida East Coast R. Co., 69 Fla. 165, 67 South. Rep. 906. The courts uniformly hold that the question of the reasonableness of a rate fixed by an order of the Railroad Commissioners cannot be conclusively determined by the legislature of the State or by a Commission acting under its authority so as to preclude the possibility of judicial inquiry. Under the guaranty of due process of law a carrier has a right to judicial investigation as to the reasonableness of an order made by Railroad Commissioners affecting the carrier's rights. The verdict of a jury, the decision of arbitrators and the judgment of a court are conclusive upon the parties until set aside or annulled for some reason in law. The parties have had their day in court, have been heard upon the law and evidence before the tribunal possessing the power and authority to determine the questions, but the very authority of the Railroad Commissioners in making such an order as the one involved in this case depends upon the fact that evidence was before them upon which to base the order. To say that a carrier against whom such an order is made can-

not call a Railroad Commissioner as a witness to show that he had no evidence before him on which to base the order, or the character of evidence which was before him, would be in effect to hold the order itself conclusive of its reasonableness and accomplish indirectly by a technical rule of evidence made for the occasion that which admittedly cannot be directly accomplished by legislative enactment. It would render meaningless the language of the Supreme Court of the United States in Louisville & N. R. Co. v. Railroad Commissioners, 235 U. S. 601, 35 Sup. Ct. Rep. 146; Interstate Commerce Commission v. Union Pac. Ry. Co., 222 U. S. 541, 32 Sup. Ct. Rep. 108. How could it be shown that no evidence was before the Commissioners and none considered by them in making the order unless by the very persons before whom it was pretended to be submitted? The law does not require them to preserve the evidence in writing and file it, nor recite it in their orders, therefore the absence of any such record from the files of their office raises no presumption that no evidence was heard.

The next question presented for our consideration is: Does the evidence clearly and satisfactorily show that the cost to the respondent or expense incurred by it in handling the Class "P" traffic is equal to or more than the receipts derived from such traffic?

This question is one of considerable perplexity and has engaged our sedulous attention. The difficulty arises not on account of the principle of law which we conceive to apply to the question, but because of the form in which the evidence is presented to us. Much of the testimony that was taken appears to be of little or no value so far as its relevancy to the vital question is concerned, and some of the witnesses called by both relator

and respondent use technical words and phrases in explanation of the exhibits, which may be perfectly clear in meaning to them or any expert railroad transportation accountant, but are not so to us, nor apparently to counsel. It has therefore been necessary for us to acquaint ourselves with many of these forms of expression and ascertain so far as possible their true significance before undertaking to apply the testimony to sheets prepared to show the various accounts and filed as exhibits.

We are concerned in this matter with the following questions: 1st. Taking the accounts for the year ending June 30, 1914, as the basis upon which to make the comparison between revenue and expense in Class P traffic. What revenue did respondent derive from that class of traffic? 2nd. What expense was properly incurred by respondent in handling that class of traffic? 3rd. In apportioning respondent's entire railroad expenses between the different classes of railroad traffic, does the evidence clearly and satisfactorily show that respendent's method is correct? 4th. Applying to the accounts of that year and the year ending June 30th, 1915, the rates proposed by Order No. 431, does the evidence clearly and satisfactorily show that the respondent's revenue from that class of traffic would be reduced to such an extent that the expense would be legally disproportionate to the revenue that would be derived? 5th. Should the interest upon the bonded indebtedness of the road and taxes be considered as a proper item of expense to be apportioned between the different classes of railroad traffic? 6th. Should Rule 19 prescribed by the Railroad Commissioners which makes a reduction of ten per cent in the rates where the freight passes over two roads in intrastate commerce and a reduction of twenty

per cent in the rates where the freight passes over three or more roads, and which has been ordered by this court to be put into effect by respondent, be taken into account in ascertaining the revenues that may be derived from Class P traffic under Order No. 431?

Taking the figures of Mr. W. J. Buchanan, a witness for respondent and whose occupation is that of assistant traffic director of the Minneapolis Traffic Association and who was employed by the respondent to investigate the cost of Class P rates to its road, it appears that for the two years ending June 30, 1914 and 1915, the total revenues increased in the last year over the former by $165,658.94, while the expenses for the same period decreased about $330,059.78, or a difference in favor of the road due perhaps to increased business and increased efficiency in management of approximately a half million dollars. And the freight revenue of the road shows a steady increase from 1910 to 1915 inclusive, of more than 43%. The net revenue from railway operations for the year ending June 30th, 1915, appears from the figures of this witness to have been $2,094,946.81.

It appears from the testimony of Mr. C. W. Hillman, a witness called by the relator and whose occupation is an accountant and President of the Mutual Audit Company of Louisville, Kentucky, and who was employed by relator to investigate the books and papers of the Florida East Coast Railway Company in order to determine the expense on Class "P" freight; also from the testimony of Mr. J. P. Beckwith, Vice President of the respondent corporation, that the books of the company show the actual cost of the respondent company's property on August 31, 1915, to amount to $49,147,469.35. That of that sum the portion of the road from

Homestead to Key West, which is about 128.36 miles in length, and known as the Key West Extension, cost $28,035,435.20, and that the main line and branches of the road north of Homestead comprising about 568 miles of road, cost $21,112,035.15. The evidence nowhere shows what portion of the net revenue derived from railway operations for that year came from the Key West extension. The above figures showing the net revenue from railway operations for the year ending June 30, 1915, were taken from a sheet prepared by respondents which shows that the railway operating expenses for that year amounted to $3,418,530.68, but another sheet shows and Mr. Buchanan in his testimony said that the expense for that year was only $3,323,161.17, which would increase the showing of net revenue for that year about $95,000.00.

Now the revenue derived by respondent from Class P traffic for the year ending June 30, 1914, according to the witness Buchanan was $207,289.84 exclusive of interstate busniess, and according to the witness Hillman $221,798.12, and for the year ending June 30, 1915, according to Buchanan, it was $225,061.84. The effect of the application of the rates prescribed by Rule 19 is not considered in these figures because that rule has never been in force on respondent's road, the judgment of this court having been superseded on writ of error taken to the Supreme Court of the United States.

The second and third questions, viz, The expense incurred by respondent in handling Class P traffic and the correctness of the method in arriving at that expense, we will undertake to consider together. The figures of Mr. Buchanan show the expense chargeable to Class "P" intrastate traffic for the year ending June 30, 1914, to be $187,960.85, or a net profit of $19,328.99, and

for the year 1915 to be $195,601.15, or a net profit of $29,460.69. According to this witness the effect of Order No. 431 on Class P intrastate business for 1914 would have reduced the earning on that traffic $26,-415.22, or .127% and on the 1915 business $33.648.84, or .149%, and if Rule 19 had been in force a further reduction of $7,338.41, or .182%. It appears by the testimony of this witness that if the Order No. 431 was applied to the traffic of 1914 there would have been a loss of $7,086.23, and if both orders were applied to the traffic of 1915 there would have been a loss of $11,-526.56, or if Order 431 alone was applied, a loss of $4,-188.15. Now taking the figures of Hillman for 1914, Class "P" traffic shows a revenue to respondent of $221.798.12. The respondents' witness Buchanan shows that the application of Order 431 to that business would have reduced it .127%, or $28,168.36. So the revenue would have been for that year $193,629.76 if Hillman's estimate of the income was correct, showing a profit of $5,678.91 instead of a loss of $7,086.23 according to Buchanan. The operating expenses for the year ending June 30, 1914, have been apportioned between the freight and passenger traffic by the two experts differently. The operating expenses for that year which amounted to $3,653,220.95 were so apportioned between freight and passenger traffic as that by Hillman $2,010,-433.52 was assigned to freight, while Buchanan assigned to that traffic $2,074,830.18. That is to say Mr. Buchanan charged to freight expenses $64,396.36 more than Mr. Hillman. This difference arises in the assignment of the different primary accounts, as for instance, under the head of "Traffic Expense" account No. 55 "Advertising" $32,546.84 was assigned by Hillman exclusively

to the passenger traffic, while Mr. Buchanan assigned about .507 per cent or $16,514.27 of that account to freight. The account of "Outside Agencies" No. 54. $27,450.34 is assigned as follows : by Hillman $4,510.65 to freight, the remainder to passenger. Mr. Buchanan assigns 53.32% to freight, or about $14,636.52 to freight, while account No. 53 "Superintendence-Traffic" $30,578.70, Hillman assigns $17,975.50 to freight, and Buchanan about $16,204.56 to that traffic. Of the account called Fuel for Road Locomotives, Mr. Hillman assigns $3,173.13 less to freight than Mr. Buchanan, and so on through the assignment of the general expenses between passenger and freight there are differences between the two witnesses which seem to be irreconcilable. We have failed to discover any evidence which clearly shows that the respondent's method of arriving at the proper assignment of the general expenses is preferable. The assignment of these expenses is more or less arbitrary but undoubtedly the purpose is to so divide the expense as that each department of service shall carry its proper and just proportion.

If it is true that the passenger traffic of a common carrier of freight and passengers shows a loss to the carrier it seems that fairness would require that in case of doubt as to the proper assignment of general expenses it should be resolved in favor of the passenger traffic; but where these differences arise we do not find the evidence of respondent to be conclusive of the accuracy of its method nor of the fallacy of relator's method.

On the question of the assignment of the advertising account No. 55 for instance, while it may be true that resulting from the advertisements of the road and the country through which it passes the country may increase its population eventually by settlers attracted by such ad-

VOL. 72, JUNE TERM, 1916. 403

State ex rel. R. R. Comrs. v. F. E. C. Ry. Co.—Opinion of Court

vertisements, who in the course of time would produce freight business for the road, but to assume that because of such possibility more than 50% of the account should be charged to freight seems more unreasonable than to charge it all to the passenger traffic. Another point of difference between the two accountants arises on the item properly chargeable off the freight expense on account of company material hauled on freight trains exclusively for the passenger service. The percentage of the total freight cost on this account was 4,633%, or $93,752.81 according to Mr. Hillman. The purpose in apportioning the expenses of railroad traffic being to show the cost incurred in handling each class of traffic, it would seem that any expense incurred exclusively for any one class should be borne by that class and as it nowhere appears that the passenger service paid the freight service in dollars for hauling this material, nor credit allowed on the books so as to show in the freight earnings, it follows that to disregard the item would be to require the freight department to perform the service for nothing to the benefit of the passenger service. By this method one class of patrons would derive a benefit from a burden placed upon another class.

Another material point of difference between relator and respondent arises from the contention of relator that the item of switching charges should be estimated and its proper proportion carried to the earnings of Class P traffic. As the expense incurred in switching cars is embraced in the general expense of operating the road and is therefore included in the apportionment to Class "P," that class is entitled to its just proportion of the revenue derived from that source. The evidence is not at all clear that the calculations of Mr. Hillman are erroneous. The apportionment of the income from that

404    SUPREME COURT OF FLORIDA,

State ex rel. R. R. Comrs. v. F. E. C. Ry. Co.—Opinion of Court

source is based upon the gross tonnage upon the theory that it costs no more to switch a car load of Class "P" commodities than to switch a car loaded with any other material.

The operating percentage as estimated by Mr. Hillman, however, under the new rate which is less than the estimate under the present rate, when applied to the earnings as shown by him shows a profit on Class "P" traffic of more than $39,000.00, and if that operating rate be applied to the earnings as estimated by Mr. Buchanan under Rule 431 a profit of more than $32,-000.00 would be shown even if the proportion of Class P switching revenue be disallowed. "The proper judicial test however is to apply the proposed rates to the business that has been done and see whether upon that basis such rates will be remunerative or compel the transaction of business at a loss." Chicago & N. W. Ry. Co. v. Dey, 35 Fed. Rep. 866. Mr. Hillman undertook to do this and found that the cost of conducting Class "P" traffic by respondent was .820515% of the revenue derived. This estimate was based upon an average haul of 118.41 miles of the freight tonnage which was obtained by dividing what is called the ton miles by the tons carried. According to Mr. Buchanan the average haul according to this method of arriving at it was much less. This difference arises from the difference between the figures of the two accountants as to the tons hauled and ton miles of Class "P", Mr. Hillman making the ton miles greater and the tons less than Mr. Buchanan. The operating expense according to the figures of the latter therefore if expressed in percentage would be greater than that shown by Mr. Hillman. Assuming, however, that the number of cars hauled, tons carried,

miles traveled and revenue produced by Class P may be with reasonable accuracy obtained from the books, way bills and other vouchers in respondent's office and that as to these items the respondent's figures are correct, yet the cost.per ton of carrying the Class P material for the average distance must depend upon the apportionment of the total operating expense to the particular traffic. As has been said before this apportionment between the two great classes of traffic, passenger and freight, is to a large extent arbitrary, the merest guess work. As shown by the exhibits in this case less than thirty-three per cent of the total expense was placed to the account of freight and a little over half of that percentage to the passenger traffic on the basis of service. Therefore over sixty-six per cent of the total expense is admittedly common to both branches of traffic and the basis of the assignment of that portion of the general expense rests upon supposition, theory and conjecture. But after it has been determined what portion of the general expense should be assigned to freight (in this case the figures of the two experts differ about sixty-four thousand dollars) there is the still more arbitrary subdivision of that amount between the different classes of freight traffic. For this purpose different methods are followed by different accountants and traffic theorists who in pursuit of their respective theories lead one through bewildering labyrinths of figures, technical expressions void of practical meaning and confusing averages "puzzled with mazes and perplexed with error." Taking the same figures as to general expenses, and revenue derived, track and yard mileage, tons hauled, cars handled, miles that cars were hauled and freight carried and other information that .may be definitely obtained from the books and vouchers

of any transportation company, the same transportation accountant could by the application of different theories and methods arrive at wholly different results as to the operating expense of any given class of traffic. It is impossible for a court, therefore, to inquire minutely into each item which enters into the calculations of the re-respective parties and determine whether this or that method of computation is accurate or not. Until some definite standard or rule for the ascertainment of the expense that should be apportioned to each class of traffic has been settled upon and proven to be accurate and fair to the road and its patrons any calculation intended to show the expense incurred by any given class of freight traffic must rest largely upon theories supported by assumptions unproven, premises not clearly established. And so it follows that "with respect to particular rates there is a wide field of legislative discretion permitting variety and classification."

Now the question here is does the evidence clearly and satisfactorily show that the relator has attempted to compel the respondent to carry the commodities included in Class "P" traffic at a loss or without substantial compensation the profitableness of the intrastate business as a whole not being involved? Northern Pacific Ry. Co. v. North Dakota, 236 U. S. 585, 59 L. Ed. 735, 35 Sup. Ct. Rep. 429.

We find that the cost apportioned to Class "P" traffic by respondent has not been sufficiently and clearly shown to be accurate, and that the percentage of reduction in the earnings of Class "P" traffic affected by the order as contended for by respondent is erroneous, that the cost of carrying the company material exclusively for use by the passenger service should not be charged

to the freight account, that Class "P" should be credited with its due portion of the switching charges.

If Rule No. 19 should be considered in this case it is not clearly apparent that this rule will so reduce the earnings as to make the rate under Order No. 431 confiscatory.

Actual experience of the enforcement of these orders may in the future establish a case for respondent upon the question of the confiscatory character of the rates prescribed, in which event it will not be precluded from reopening the question by appropriate proceedings. See State *ex rel.* Railroad Commissioners v. Louisville & N. R. Co., 63 Fla. 274, 57 South. Rep. 673; Pensacola & A. R. Co. v. State, 25 Fla. 310, 5 South. Rep. 833; Northern Pac. R. Co. v. State of North Dakota *ex rel.* McCue, 216 U. S. 579, 30 Sup. Ct. Rep. 423; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. Rep. 192; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 Sup. Ct. Rep. 811.

Interest and taxes are matters to be considered in determining whether the rate to be enforced provides a reasonable or fair compensation for the service, but do not enter into the estimates of the cost of the service. After ascertaining the cost to the respondent in hauling the particular traffic and the revenue derived therefrom, the question arises whether after paying the expenses properly chargeable to the particular traffic is there enough left to pay that portion of the taxes and interest on investment which the value of the property employed in the traffic bears to those items. The showing made by the respondent is that a profit resulted in 1914 from Class "P" traffic, and a greater profit in 1915. Now the interest on the funded and unfunded indebtedness and taxes apportioned by respondent to this class of traffic is suffi-

cient to wipe out the profit and create a deficit, but the respondent takes the income as the basis of this apportionment instead of the value of the property devoted to the particular traffic which latter we think would be the proper measure or ratio if it should be considered at all. Even if it was clearly apparent from the evidence that respondent's apportionment of the expense to Class "P" was correct, the figures of its accountant show a net profit to respondent on the business of 1914 and 1915, and it is not clearly shown that the enforcement of the order would eliminate that profit or reduce it to a merely nominal sum.   The figures of the relator's accountant on the other hand, and which appear to us to be more nearly correct, show that the enforcement of the order would still leave a profit on the particular traffic of over ten per cent.

Our conclusion is that the respondent's return is not supported by the evidence and that a peremptory writ of mandamus should issue.

TAYLOR, C. J., and SHACKLEFORD, COCKRELL and WHITFIELD, JJ., concur.