STATE EX REL. RAILROAD COMMISSIONERS, *Relators*, v. ATLANTIC COAST LINE RAILROAD COMPANY AND CLYDE STEAMSHIP COMPANY, *Respondents*.

Opinion Filed February 15, 1921.

1. Entire and exclusive jurisdiction over the matter of requiring physical connection between rail and water carriers has been given by Congress to the Interstate Commerce Commission, and there is no field for the operation of State laws, or control by the State Railroad Commission, over the same subject matter.

2. Until Congress gave to the Interstate Commerce Commission entire and exclusive jurisdiction over the matter of physical connection between rail and water carriers, the State had full power and jurisdiction over the subject,

but when Congress exercised the power, and lodged the entire and exclusive jurisdiction over it in the Interstate Commerce Commission, the right of the State over the same subject matter was extinguished.

3. A concurrent power of the Federal and State governments may be exercised by the States until the same field is covered by Congress, and when that is done, State legislation on the subject becomes inoperative and ineffective.

4. The test is not whether the State legislation is in conflict with the details of the Federal law or supplements it, but whether the State has any jurisdiction of a subject over which Congress has exerted its exclusive control.

Peremptory writ denied.

*D. C. McMullen* and *Dozier A. DeVane,* for Relators;

*W. E. Kay,* for Atlantic Coast Line Railroad Company, and *Kay, Adams & Ragsland,* for Clyde Steamship Company.

BROWNE, C. J.—The opinion in this case on the order overruling a demurrer to the return, denying motions to strike portions of the return, and denying a peremptory writ on the pleadings herein, was predicated upon the theory that the mandamus sought by the Railroad Commissioners was to require the Atlantic Coast Line Railroad Company and the Clyde Steamship Company to rebuild and repair the wharf adjacent to and lying immediately between the depot of the rail carrier and river, where the water carrier, at a period some years before the application for mandamus, had been in the habit of landing. State *ex rel.* Railroad Commissioners v. Atlantic Coast Line Railroad Co. and Clyde Steamship Co., 77 Fla. 366, 81 South. Rep. 498. In that opinion we

referred to the authority given the Florida Railroad
Commission "to require railroads and water carriers
serving any given point or community as common car-
riers of freight and passengers to provide such reason-
able physical connection as may be necessary to properly
facilitate the transfer of freight or passengers from one
of said carriers to the other." And "to require    *    *    *
the establishment of landings and wharves at which water
carriers may be required to stop; to designate the loca-
tion and require the erection of such freight and pas-
senger depots, houses, platforms and wharves, with all
necessary conveniences as to the safety, convenience and
comfort of passengers and the proper handling, care, pro-
tection and prompt delivery and transportation of freight
may require." But the question here involved was not
determined. We said: "In this case the State authority
is exerted to 'rebuild and repair the wharf adjacent to
and lying immediately between the depot of the' rail
carrier and the river where the water carrier lands. This
relates to a pre-existing local transportation facility and
does not manifestly or apparently conflict with the as-
serted Federal authority to require physical connection
'by' connecting the *track* of the rail carrier with the *dock*
of the water carrier."

We quote again from the opinion: "The State statute
authorizes the Railroad Commissioners 'to designate the
location and require the erection of    *    *    *    wharves
with all necessary conveniences as to the safety, con-
venience and comfort of passengers,' etc. This gives
authority to designate the actual location of a wharf for
the safety, convenience, etc., of traffic, and does not limit
the authority to the actual necessities of traffic. This
order is 'to rebuild and repair the wharf,' 'where physical
connections were formerly maintained between the said

carriers.' The wharf to be rebuilt does not appear to be any part of a track connection between the rail carrier's road and the water carrier's dock, therefore, it is not covered by the Act of Congress and is within the regulating power of the State."

It was contended by the respondents that the Panama Canal Act gave to the Interstate Commerce Commission exclusive jurisdiction over the subject matter of requiring physical connection between railroad and water carriers, and this question was not decided in the opinion on the order overruling the demurrer to the return.

It is now contended for the respondents, that since that decision was rendered, an amendment to the Federal Canal Act of Feb. 28, 1920, makes it quite clear that the Interstate Commerce Commission is given exclusive jurisdiction of this subject matter and that Congress having acted and lodged jurisdiction over the subject in the Interstate Commerce Commission there is no field for the operation of the State law on the same subject.

The alternative writ commanded the Atlantic Coast Line Railroad Company and Clyde Steamship Company and each of them "to rebuild and repair the wharf adjacent to and lying immediately between the depot of the Atlantic Coast Line Railroad Company and the St. Johns River, in Astor, Florida, by placing the same in such condition that freight or passengers can be safely, securely and conveniently transferred over the said wharf from one of said carriers to the other, and in all respects to comply with, observe and obey the said Order No. 549 as above set forth."

The Railroad Commissioners' Order No. 549 referred to in the alternative writ is entitled, "In the Matter of

Physical Connections at Astor, Florida," and after reciting the notice and other matters of inducement, proceeds: "and the Commissioners having made physical examination of the location with a view to determining the practicability of providing such connections, do find that the convenience of shippers and passengers to and from a large section of Lake County, together with the possibility of a large increase in traffic when necessary physical connections are provided, entirely justifies the requirement of such physical connections; and further find that the most economical and practical method of providing such physical connections is to rebuild and repair the wharf adjacent to and lying immediately between the depot of the Atlantic Coast Line Railroad Company and the St. Johns River in Astor, where physical connections were formerly maintained between the said carriers."

The petition upon which the Railroad Commissioners held a hearing, as a result of which they issued their Order No. 549, recites:

"That if there were some physical connection between said depot and the dock of said steamship line so that freight could be transferred from one to the other, then freight shipped from Jacksonville in the afternoon would arrive at Astor at about 3:30 the next morning and could then be delivered at Astor or transferred along said railway as far as Leesburg, and even beyond, and thus arrive at its destination at a reasonable time after its shipment." The petition prays:

"That said railway company and said steamship line be required to make such reasonable physical connections between the depot of said railway company and the dock occupied or that shall be occupied by said steamship line

as may be necessary to properly facilitate the transfer of freight and passengers from one to the other."

It is quite clear from the petition and Order No. 549 of the Railroad Commission, that the afternative writ was invoked to require the Clyde Steamship Company and the Atlantic Coast Line Railroad Company to make physical connections at the steamboat landing on the St. Johns River and the Atlantic Coast Line Railway at Astor.

That something more is intended than the mere rebuilding and repairing of the wharf at Astor is apparent from the fact that the writ is addressed to the Atlantic Coast Line Railroad Company and the Clyde Steamship Co., although the wharf in question belongs solely to the Atlantic Coast Line Railway, and in addition to rebuilding and repairing the wharf they are required to place "the same in such condition that freight or passengers can be safely, securely and conveniently transported from the said wharf from one of said carriers to the other, as prescribed by said order, and in all respects to fully comply with, observe and obey the said Order No. 549, as aforesaid."

The testimony taken in this case, after the order of this court overruling the demurrer to the return, shows that the purpose of this mandamus proceeding is to establish physical connection between the lines of the rail carrier, the Atlantic Coast Line Railway, and the dock at which interchange of passengers or property is to be made.

Mr. R. C. Dunn, one of the Railroad Commissioners, testified that a hearing was held at Astor in 1917 "in reference to the physical connection between the Atlantic Coast Line Railroad Company and the Clyde Steamship

Company" and that "the desire on the part of certain citizens and residents of Lake County, for this physical connection, had been brought by petition to the attention of the Commission prior to that time." Also, "if there was physical connection at Astor between the Clyde boat and the Atlantic Coast Line Railway so that freight and passengers might be transferred conveniently," etc. Also "I would make physical connection between the Clyde Line and the railroad at that dock, and it could be done, in my opinion, with very little expense, and would be done, in my opinion, if it were not for the fact that the railroad don't want the boat to have the business."

Practically all the witnesses for the relators testified that what they were seeking to have established was physical connection between the line of the rail carrier and the dock.

The section vesting in the Interstate Commerce Commission jurisdiction over such physical connection originally read: "To establish physical connection between the lines of the rail carrier and the dock of the water carrier by directing the rail carrier to make suitable connection between its line and a track or tracks which have been constructed from the dock to the limits of its right of way, or by directing either or both the rail and water carrier, individually or in connection with one another, to construct and connect with the lines of the rail carrier a spur track or tracks to the dock. This provision shall only apply where such connection is reasonably practicable, can be made with safety to the public, and where the amount of business to be handled is sufficient to justify the outlay." This was amended on Feb. 28, 1920, to read: "To establish physical connection between the lines of the rail carrier and the dock at

which interchange of passengers or property is to be
made by directing the rail carrier to make suitable con-
nection between its line and a track or tracks which have
been constructed from the dock to the limits of the rail-
road right of way, or by directing either or both the rail
and water carrier, individually or in connection with one
another, to construct and connect with the lines of the
rail carrier a track or tracks to the dock.  The Commis-
sion shall have full authority to determine and prescribe
the terms and conditions upon which these connecting
tracks shall be operated, and it may, either in the con-
struction or the operation of such tracks, determine what
sum shall be paid to or by either carrier: Provided, That
construction required by the Commission under the pro-
visions of this paragraph shall be subject to the same
restrictions as to findings of public convenience and
necessity and other matters as its construction required
under Sestion I of this Act."

If there could have been any doubt that the original
Act covered what the relators herein were attempting to
do, the amendment quite removes it.

In the amendment the words "of the water carrier,"
as applied to the dock, are omitted, and the words, "at
which interchange of passengers or property is to be
made" are added.

These words describe just what is sought by the rela-
tors.  The order of the Railroad Commission, the petition
for the writ and the alternative writ, both requiring the
wharf to be placed "in such condition that freight or
passengers shall be safely, securely and conveniently
transferred over said wharf from one of said carriers to
the other."

It is palpable, therefore, that physical connection between the lines of the carrier and the dock at which interchange of passengers or property is to be. made, is what is sought, and it is that which Order No. 549 is intended to effect, and which the mandamus requires.

The Panama Canal Act, as amended, gives to the Interstate Commerce Commission exclusive jurisdiction of this subject-matter, as it covers the same subject as that sought to be enforced by this mandamus proceeding.

Under the laws of Florida the Railroad Commission has authority "to require railroads and water carriers serving any given point or community as common carriers of freight and passengers to provide such reasonable physical connection as may be necessary to properly facilitate the transfer of freight or passengers from one of the carriers to the other."

The Panama Canal Act gives the Interstate Commerce Commission jurisdiction "To establish physical connection between the lines of the rail carrier and the dock at which interchange of passengers or property is to be made by directing the rail carrier to make suitable connection between its lines and a track or tracks which have been constructed from the dock to the limits of the railroad right of way, or by directing either or both the rail and water carrier, individually or in connection with one another, to construct and connect with the lines of the rail carrier a track or tracks to the dock. The Commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated, and it may, either in construction or the operation of such tracks, determine what sum shall be paid to or by either carrier."

This is most comprehensive. It includes all that the Railroad Commission is attempting to do in this matter, and more. It empowers the Interstate Commerce Commission to require physical connection to be made; to require the railroad to make the connection in certain instances; to require either or both the rail and water carrier to make the connection; to require them individually or in connection with one another to do so; to determine and prescribe the terms and conditions upon which the connecting tracks shall be operated; the sum to be paid by either carrier.

That which the Florida statutes give the Railroad Commission authority to do, Congress gives the Interstate Commerce Commission jurisdiction over.

There is nothing sought by this proceeding that is not embraced within the provisions of the Act of Congress.

Until Congress acted, there could be no question of the power of the State over the matter in controversy, but when Congress exercised the power, and lodged jurisdiction over it in the Interstate Commerce Commission, it took it out of the jurisdiction of the State, and the right of the State over the same subject matter was extinguished. This is the doctrine laid down by MR. CHIEF JUSTICE MARSHALL in Sturges v. Crowninshield, 4 Wheat. (U. S.) 122, 4 L. Ed. 529;

"It may be thought more convenient that much of it should be regulated by State legislation, and Congress may purposely omit to provide for many cases to which their power extends. It does not appear to be a violent construction of the Constitution, and is certainly a convenient one, to consider the power of the States as existing over such cases as the laws of the Union may not

reach.  But be this as it may, the power granted to Congress may be exercised or declined as the wisdom of that body shall decide.  If, in the opinion of Congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that State legislation on the subject must cease.  *It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the States.*  It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the States.''

This was followed in Prigg v. Pennsylvania, 16 Pet. (U. S.) 539, in an opinion by MR. JUSTICE STORY.

The doctrine seems well settled that where a power is exclusive in the national government it cannot be exercised by the States, but it is a concurrent power of the Federal and State governments, it may be exercised by the States until the same field is covered by Congress, and when that is done, State legislation on the subject becomes inoperative and ineffective.  Prigg v. Pennsylvania, *supra;* Sturges v. Crowninshield, *supra.*

In the case of Prigg v. Pennsylvania, *supra,* the court said: ''For, if Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the State legislatures have a right to interfere; and, as it were, by way of complement to the legislation of Congress to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose.  In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter.  Its silence as to

what it does not do is as expressive of what its intention is as the direct provisions made by it  *  *  * the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed."

MR. JUSTICE LAMAR, in the case of Southern Railway Co. v. Indiana Railroad Commission, 236 U. S. 439, 59 L. Ed. 661, 35 Sup. Ct. Rep. 304, following Sturges v. Crowninshield and Prigg v. Pennsylvania, said:

"Congress, of course, could have 'circumscribed its regulations' as to occupy a limited field. Savage v. Jones, 225 U. S. 502, 533, 56 L. Ed. 1182, 1194, 32 Sup. Ct. Rep. 715; Atlantic Coast Line R. Co. v. Georgia, 234 U. S. 280, 293, 58 L. Ed. 1312, 1318, 34 Sup. Ct. Rep. 829. But so far as it did legislate, the exclusive effect of the safety appliance Act did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employees. The States thereafter could not legislate so as to require *greater* or *less* or *different* equipment; nor could they punish by imposing greater or less or different penalties." Italics are mine.

MR. JUSTICE LAMAR epitomized several cases that are illustrative of the principle involved here. Thus:

"In St. Louis, I. M. & S. R. Co. v. Edwards, 227 U. S. 267, 57 L. Ed. 506, 33 Sup. Ct. Rep. 262, it was held that the Arkansas statute imposing a penalty for failing to deliver cars had been superseded by the provisions of the Hepburn Act, although the provisions of the two statutes were not identical. In Northern P. R. Co. v. Washington, 222 U. S. 371, 56 L. Ed. 237, 32 Sup. Ct. Rep. 160, it

was held that congressional legislation as to hours of service so completely occupied the field as to prevent State legislation on that subject. In Erie R. Co. v. New York, 233 U. S. 671, 58 L. Ed. 1149, 51 L. R. A. (N.S.) 1097, 34 Sup. Ct. Rep. 756, a like ruling was made in a case where the New York law punished a railroad company for allowing an employee to work more than eight hours when the Federal statute punished the company for employing him for more than nine hours—even though it was argued that the State legislation was not in conflict with the Federal Act, but rather in aid of it. The same contention is made here, inasmuch as the Indiana law requires hand holds on sides or ends of cars, while the Federal statute requires hand holds to be placed both on the sides and ends of cars.

"The test, however, is not whether the State legislation is in conflict with the details of the Federal law or supplements it, but whether the state had any jurisdiction of a subject over which Congress had exerted its exclusive control."

State laws relating to pilots, quarantine, policing harbors, improving navigable channels, wharves, bridges and ferries, where the entire subject has not been covered by congresional action, are not violative of the constitutional provision giving to Congress the right to regulate interstate and foreign commerce. As was said in Western Union Telegraph Company v. Lee, 174 Ky. 210, 192 S. W. Rep. 70: "It is not the existence of the power of Congress to regulate commerce in this class of cases, but the exercise of that power by Congress that will prohibit State action. In this class State action is permissible in the absence of congressional regulations."

In the case of Gardner. v. Western Union Telegraph Co., 231 Fed. Rep. 405, the Circuit Court of Appeals for the 8th Circuit said: "Congress has taken possession of the field of interstate commerce by telegraph, and it results that the power of the State to legislate with reference thereto has been suspended." Durre v. Western Union Tel. Co., 165 Wis. 190, 161 N. W. Rep. 755.

Whatever may have been the opinion of this or other courts prior to the adoption of the Panama Canal Act and the amendments of Feb. 28, 1920, they are not binding upon us in view of the changed condition of the law whereby Congress has taken possession of the entire field of regulating physical connections between rail and water carriers that may be engaged in interstate or foreign commerce, by giving to the Interstate Commerce Commission jurisdiction thereof.  As was said in Haskell Implement & S. Co. v. Postal Telegraph-Cable Co., 114 Me. 277, 96 Atl. Rep. 219:

"Many changes have occurred in business and business regulation in the 28 years since the decision of the Ayer case and the creation of the Interstate Commerce Commission.  The decision stands, but the Commerce Act has expanded until it comprehends and includes the questions involved in the case at bar, and so including, it must perforce, being the supreme law, suspend the operation of any State statute or regulation, or the force and effect of any decision in opposition thereto, the Ayer case among the rest, so far as they conflict with the Act of June 18, 1910. This rule does no violence to any State, corporation, or individual, and is in keeping with the sentiment and reasons underlying sound public policy, the highest good, the best interest of all the people, not that of one State or one locality. Minnesota Rate Cases,

Simpson v. Shepard, 230 U. S. 352, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. Rep. 501, 59 L. Ed. 835." See also Western Union Tel. Co. v. Smith (Tex. Civ. App.) 188 S. W. 702; Poor 'Grain Co. v. Western Union Tel. Co., 196 Mo. App. 557, 196 S. W. Rep. 28.

We have examined the cases cited by the relators, but fail to find that they lay down a doctrine contrary to that announced in Sturgis v. Crowninshield, and followed by an unbroken line of decisions down to the present time.

In the case of Missouri P. R. Co. v. Larabee Flour Mills Co., 211 U. S. 612, 29 Sup. Ct. Rep. 214, the court recognized and sanctioned this doctrine, but found that there had been no action by Congress or the Interstate Commerce Commission, and that therefore a State court may by mandamus compel a railroad company doing interstate business to afford equal local shipping service to its shippers, notwithstanding the cars in regard to which the service is claimed are eventually to be engaged in interstate commerce. From this it seems that if Congress had expressly lodged in the Interstate Commerce Commission the power and duty with regard to switching service, as it has with regard to requiring physical connection between rail and water transportation, the court would have held that the State was without authority to regulate the subject.

The peremptory writ is denied.

TAYLOR AND ELLIS, J. J., concur.

WHITFIELD AND WEST, J. J., dissent.

WHITFIELD, J., dissenting.

The alternative writ commands the respondents "to rebuild and repair" a wharf between the railroad depot and the St. Johns River.

In a former opinion overruling a demurrer to the return, denying motions to strike portions of the return, and denying a peremptory writ on the pleadings herein, it was held that the Federal Canal Act of August 24, 1912, giving to the Interstate Commerce Commission jurisdiction to regulate stated common carriers and their transportation business, including the establishment of "physical connection between the lines of the rail carrier and the dock of the water carrier," did not conflict with or supersede the statutory authority of the State Railroad Commission "to require railroads and water carriers serving any given point or community * to provide such reasonable physical connection as may be necessary to properly facilitate the transfer of freight or passengers from one of said carriers to the other," in so far as such statutory authority was exerted to require a railroad and a water carrier to "rebuild and repair the wharf" theretofore used in the transfer of freight and passengers between the rail and water carriers; and it was further held that on the admissions of the demurrer to the return, which return sets up facts tending to show unreasonableness in the order with reference to the questioned needs of the public and the appreciably added burden of expense and inconvenience to the carriers, a defense to the writ was averred. State *ex rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., 77 Fla. 366, 81 South. Rep. 498. Issue was joined on the return and voluminous testimony taken.

It is now contended for the respondents that an amend-
ment to the Federal Canal Act of February 28, 1920,
clearly gives to the Interstate Commerce Commission ex-
clusive jurisdiction of this subject-matter and that the
evidence clearly establishes the asserted unreasonableness
in the order commanding the carriers to "rebuild and re-
pair the wharf adjacent to, and lying immediately be-
tween, the depot" of the rail carrier and the St. Johns
River at Astor, Florida, when the order is "considered
with reference to all the substantial interests affected by
it."

The original Canal Act gave the Interstate Commerce
Commission jurisdiction in requiring · carriers "to estab-
lish physical connection between the lines of the rail car-
rier and the dock of the water carrier *by* directing the rail
carrier to make suitable connection between its line and
a track or tracks which have been constructed from the
dock to the limits of its right of way, or by directing
either or both the rail and water carrier, individually or
in connection with one another, to construct and connect
with the lines of the rail carrier a spur track or tracks to
the dock." State ex rel. Railroad Commissioners v. At-
lantic Coast Line R. Co., 77 Fla. 366, 81 South. Rep. 498,
text 500. By amendment the provision is "to establish
physical connection between the lines of the rail carrier
and the dock *at which interchange of passenger or prop-
erty is to be made* by directing the rail carrier to make
suitable connection between its line and a track or tracks
which have been constructed from the dock to the limits
of the railroad right of way, or by directing either or
both the rail and water carrier, individually or in con-
nection with one another, to construct and connect with
the lines of the rail carrier a track or tracks to the dock."

The change in the law is shown by the italicized words. It is obvious that both the provisions relate to physical connection by *tracks* and that the italicized words do not add to the jurisdiction conferred by the original act, but merely adds to the designation or description of the facilities over which jurisdiction is conferred. In discussing the supremacy of the Federal law the United States Supreme Court has said: "The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution (of the United States) is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with or are contrary * to the laws of Congress, made in pursuance of the Constitution, or some. treaty made under the authority of the United States. In every such case the act of Congress or treaty is supreme, and the law of the State, though enacted in the exercise of powers not controverted, must yield to it. The same doctrine was asserted in the case of Brown v. the State of Maryland, 12 Wh. pages 448, 449, and in numerous other cases. (5 How. pages 573, 574, 579, 581; 2 Peters, 251, 252; 4 Wh. pages 405, 406, 436).

"We agree that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together; and also, that the act of Congress should have been passed in the exercise of a clear power under the Constitution, such as that in question." Sinnot v.

Commissioners of Pilotage of Mobile, 22 How. (U. S.) 227, text 242, 243.

"Where an act of Congress relating to a subject on which the State may act also limits its prohibitions, it leaves the subject open to State regulation as to the prohibitions, which are unenumerated.

"In determining whether a Federal act overrides a State law, the entire scheme must be considered and that which needs must be implied has no less force than that which is expressed.

"The intent of Congress to supersede the exercise by the States of their police power will not be inferred unless the act of Congress, fairly interpreted, is in actual conflict with the law of the State." Savage v. Jones, 225 U. S. 501, text 502, 503, 32 Sup. Ct. Rep. 715.

"While Congress has exclusive power to regulate interstate commerce, and the State may not, when Congress has exerted that power, interfere therewith, even in the otherwise just exercise of its police power, the State may in such a case act until Congress does exert its authority, even though interstate commerce may be incidentally affected." Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. Rep. 501.

The subject-matter of the order, a wharf used for the interchange of traffic between a rail carrier and a water carrier, may be used as a part of interstate transportation, but a wharf is local in its nature, and is not of that character of transportation facilities which requires general and uniform regulation. For these reasons State regulation is not wholly excluded by virtue of the commerce clause of the Federal Constitution; but as the subject may require special regulations to meet local condi-

tions, and the regulations being in aid of interstate as well as intrastate commerce, in so far as they affect interstate commerce, such regulations are permissible, until Congress asserts its superior power by regulations that clearly and actually conflict with the State regulations. Where the conditions warrant it, the rule stated has been applied to the instrumentalities as well as to the subjects of interstate commerce.    Missouri, K. & T. R. Co. of Texas v. Harris, 234 U. S. 412, 34 Sup. Ct. Rep. 790, L. R. A. 1915E, 942; Missouri P. R. Co. v. Larabee Flour Mills Co., 211 U. S. 612, 29 Sup. Ct. Rep. 214; Transportation Company v. City of Parkersburg, 107 U. S. 691, 2 Sup. Ct. Rep. 732; Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 33 Sup. Ct. Rep. 729, 48 L. R. A. (N. S.) 1151, Ann, Cas. 1916A 18; State *ex rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., 77 Fla. 366, 81 South. Rep. 498; 12 C. J. 41; 5 R. C. L. 751; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. Rep. 501; Sligh v. Kirkwood, 65 Fla. 123, 61 South. Rep. 185; Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. Rep. 715; Carey v. State of South Dakota, 250 U. S. 118, 39 Sup. Ct. Rep. 403; Corn Products Refining Co. v. Eddy, 249 U. S. 427, 39 Sup. Ct. Rep. 325; Hebe Co. v. Shaw, 248 U. S. 297, 39 Sup. Ct. Rep. 125; Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. Rep. 92; Asbell v. State of Kansas, 209 U. S. 251, 28 Sup. Ct. Rep. 485; Crossman v. Lurman, 192 U. S. 189, 24 Sup. Ct. Rep. 234; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. Rep. 564; Nashville, C. & St. L. Ry. Co. v. Alabama, 128 U. S. 96, 9 Sup. Ct. Rep. 28; New York, N. H. & H. R. Co. v. People of State of New York, 165 U. S. 628, 17 Sup. Ct. Rep. 418; Missouri, K. & T. Ry. Co. v. Haber, 169 U. S. 613; 18 Sup. Ct. Rep. 488; Southern R. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. Rep. 140; Atlantic Coast Line R. Co. v. State of Georgia, 234 U. S. 280, 34 Sup. Ct. Rep. 829; Chicago,

R. I. & P. R. Co. v. State of Arkansas, 219 U. S. 453, 31 Sup. Ct. Rep. 275; Missouri Pac. R. Co. v. State of Kansas *ex rel.* Railroad Com'rs, 216 U. S. 262, 30 Sup. Ct. Rep. 330; 12 C. J. 41, 74; South Covington & Cincinnati St. Ry. Co. v. Kentucky, 252 U. S. 399, 40 Sup. Ct. Rep. 378, decided April 19, 1920; State *ex rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., *supra.* State *ex rel.* Railroad Com'rs v. Louisville & N. R. Co., 62 Fla. 315, 57 South. Rep. 175; Mill Creek Coal & Coke Co. v. Public Service Commission, — West. Va. —, 100 S. E. Rep. 557, 7 A. L. R. 1081; Pittsburg, C. C. & St. L. R. Co. v. State of Indiana, 172 Ind. 147, 87 N. E. Rep. 1034, affirmed in 223 U. S. 713, 32 Sup. Ct. Rep. 520.

The Florida statute does not supplement the Federal Act, but covers a subject not included in the Federal statute. See Savage v. Jones, and Sligh v. Kirkwood, *supra.* Even if the Federal Act fairly covers the subject, it does not appear that any action has been taken thereunder. See Missouri P. R. Co. v. Larabee Flour Mills Co., *supra.* No purpose is shown by the Canal Act to suspend State action in this particular matter as in Northern Pac. R. Co. v. State of Washington *ex rel.* Atkinson, 222 U. S. 370, 32 Sup. Ct. Rep. 160, where the hours of service on interstate trains was the subject of State and Federal Acts. See Hamilton v. Kentucky D. & W. Co., 251 U. S. 146, 40 Sup. Ct. Rep. 106.

There is no clear and actual conflict between the *limited* authority conferred by Congress upon the Interstate Commerce Commission relative to *track connections* between a dock and the line of a rail carrier, and the authority here exerted by the State to require the carrier to "rebuild and repair" a wharf. Consequently the State authority is not as a matter of law excluded from this

sphere of regulation. State *ex. rel.* Railroad Commissioners v. Atlantic Coast Line R. Co., *supra.* The order is not a direct or unreasonable burden upon interstate commerce. See State *ex rel.* Railroad Com'rs v. Louisville & N. R. Co., *supra.* In such cases as Pennsylvania R. Co. v. Public Service Commission of Pennsylvania, 250 U. S. 566, 40 Sup. Ct. Rep. 32, decided November 10, 1919; Southern R. Co. v. Indiana Railroad Commission, 236 U. S. 439, 35 Sup. Ct. Rep. 304, the assertion of paramount Federal authority had covered the field and therefore had precluded or superseded State regulations. See also P.. T. C. Co. v. Warren Godwin, 251 U. S. 27, 40 Sup. Ct. Rep. 69; W. U. Tel. Co. v. Wright, 79 Fla. 600, 84 South. Rep. 604; Charleston & W. C. R. Co. v. Varnville Furniture Co., 237 U. S. 597, 35 Sup. Ct. Rep. 715; New York Cent. R. R. Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. Rep. 546.

It appears that the rail carrier and the water carrier each transports or may transport persons and property from and to Jacksonville, Florida, and other points to and from Astor, on the St. Johns River, where the water carrier has a landing, and that points in the territory near Astor are reached by the rail carrier, but the rail haul from Jacksonville to points in the territory is much longer than the haul by water to Astor, thence by short rail haul to destination, whereas the rail carrier without the wharf connection has a long haul all rail between Jacksonville and the points that could be reached by river to Astor, thence by rail a short haul to destination in the stated territory.

The law does not give one carrier a right to a long haul merely because its main line and branches extend between given points of origin and destination when there may be a shorter route either independently of

or in conjunction with such carrier; and the mere fact that the points to be reached are on a branch line of the carrier, the operation of which apart from the main line is not profitable, does not give the carrier a right to a long haul when a shorter haul can be made available to the public without undue burden to the carrier claiming the long haul, particularly when as here shown delay and higher rates are incidents of the long haul. And the rights of the public and the duty of the regulating authority of the State in the premises are not affected by a desire or a willingness of the two carriers that the short line haul be not utilized.

The subject-matter here is not transportation or rates or rolling stock or employer's liability or hours of service or efficiency of employees, or commercial transactions, or traffic connections that may require uniformity of regulation, but it is the rebuilding and repair of a wharf that had been used, but discontinued. It is local in its nature and neither the Federal Canal Act nor its amendments appear to cover the particular subject; nor has the Federal authority been asserted by regulations or other action taken with reference to the subject so as to exclude reasonable State action upon such local subject-matter that does not conflict with Federal authority or directly or materially burden interstate commerce, but is in aid of interstate commerce in so far as it may indirectly affect it; and the regulation here assumed is not unreasonable in its requirements either as to the nature of the facility or as to its probable cost, when the rights of the public as well as those of the carriers are duly considered with reference to the particular territory and its people to be served by the use of the wharf.

A State may not require a common carrier railroad

company to repair its track when it is financially unable to do so. State *ex rel.* R. R. Com'rs v. Tavares & Gulf R. R. Co., 78 Fla. 329, 82 South. Rep. 833. And a State may not compel a railroad company to operate its road at a loss. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U. S. 396, 40 Sup. Ct. Rep. 183 ; Minneapolis, St. P. & S. S. M. R. Co., v. State of North Dakota *ex rel.* McCue, 236 U. S. 585, 35 Sup. Ct. Rep. 429.

The right of a railroad to operate as authorized by law may not be indirectly violated by imposing undue burdens of regulation that force the carrier to stop operating to avoid greater losses. But a particular useful facility may be required of a railroad common carrier, even at a loss of some of its profits. Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 27 Sup. Ct. Rep. 585 ; Missouri Pac. R. Co. v. State of Kansas *ex rel.* Railroad Com'rs, 216 U. S. 262, 30 Sup. Ct. Rep. 330 ; State *ex rel.* Railroad Com'rs v. Florida East Coast R. Co., 67 Fla. 83, 64 South. Rep. 443 ; State ex rel. Ellis v. Atlantic Coast Line R. Co., 53 Fla. 650, 44 South. Rep. 213. An unreasonable requirement may not be enforced. State *ex rel.* Railroad Com'rs v. South. Georgia Ry. Co. 80 Fla. 369, 85 South. Rep. 663 ; State *ex rel.* Railroad Com'rs v. Atlantic Coast Line R. Co., 77 Fla. 366, 81 South. Rep. 498 ; State *ex rel.* Railroad Com'rs v. Florida East Coast R. Co., 71 Fla. 433, 71 South. Rep. 543. See also Erie Ry. Co. v. Board, U. S. Supreme Court, decided January 3, 1921.

Advantages to accrue to the public by the competing routes and by having a short haul which the connections give the public a right to enjoy under the law, are made to appear by the evidence ; and while the expense to the carriers may be relatively considerable, yet it does not clear

ly appear that the advantages to the public in the use of the short haul route to which the wharf is an essential and the probable return in the short haul receipts to the carriers are so incommensurate with the expense to the carriers as to make the order to "rebuild and repair the wharf" invalid for unreasonableness.   See Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 27 Sup. Ct. Rep. 585. Missouri Pac. R. Co. v. State of Kansas *ex rel.* Railroad Com'rs, 216 U. S. 262, text 279, 30 Sup. Ct. Rep. 330; New York v. Barker, 179 U. S. 287, text 302, 21 Sup. Ct. Rep. 124; Seaboard Air Line Ry v. Railroad Commissioners of Georgia, 240 U. S. 324, 36 Sup. Ct. Rep. 260; Chesapeake & Ohio Ry. Co. v.. Public Service Commission of West Virginia, 242 U. S. 603, 61 L. Ed. 520, 37 Sup. Ct. Rep. 234; Chicago & Northwestern Ry. Co. v. Ochs, 249 U. S. 416, 39 Sup. Ct. Rep. 346; State *ex rel.* Railroad Com'rs v. Florida East Coast R. Co., 67 Fla. 83, 64 South. Rep. 443; State *ex rel.* Railroad Com'rs v. Atlantic Coast Line R. Co., 67 Fla. 441, 63 South. Rep. 729; Louisville & N. R. Co. v. Railroad Com'rs, 63 Fla. 491, 58 South. Rep. 543.

The citizens of the State who may be served through the stated rail and water route are entitled to have the Astor connection reopened to them by the rebuilding and repair of the wharf and to have reasonably adequate and efficient service thereon at rates that would be just to the public and fair to the carriers considering the peculiar burdens, if any, that are incident to the service.   As the Congress has not actually asserted its authority over the *particular subject-matter* of this writ, viz: the rebuilding and repair of a wharf, it is within the province of the State to afford the relief the people of the State are entitled to have in the premises.   State *ex rel.* v. Atlantic Coast Line Ry., 77 Fla. 366, 81 South. Rep. 498; Transportation Co.

v. City of Parkersburg, 107 U. S. 691, text 697, 2 Sup. Ct. Rep. 732; Savage v. Jones, *supra;* Sligh v. Kirkwood, *supra;* Sligh v. Kirkwood, 65 Fla. 123, 61 South. Rep. 185.

The statute provides that "every rule, regulation, schedule or order   *   made by the Commissioners shall be deemed and held   *   to be reasonable and just and such as ought to have been made in the premises and to have been properly made and arrived at in due form of procedure and such as can and ought to be executed, unless the contrary plainly appears on the face thereof or be made to appear by clear and satisfactory evidence, and shall not be set aside or held invalid unless the contrary so appears." It is not "made to appear by clear and satisfactory evidence" that the order is so unreasonable as to be invalid, therefore, a peremptory writ should be awarded.   State *ex rel.* Railroad Com'rs v. Louisville & N. R. Co., 63 Fla. 274, 57 South. Rep. 673; State *ex rel.* Railroad Com'rs v. Live Oak, P. & G. R. Co., 74 Fla. 361, 77 South. Rep. 223; State *ex rel.* Railroad Com'rs v. Florida East Coast R. Co., 72 Fla. 379, 73 South. Rep. 171.

WEST, J., concurs.